# United States Court of Appeals
## For the First Circuit

No. 21-1791

KHADIJAH AHMAD HAMDALLAH,

Plaintiff, Appellant,

JANET MARIE VEGA-RODRÍGUEZ; EDWARD NIEVES-ROMAN; MARÍA TERESA CRUZ MARRERO; RAMÓN FERNÁNDEZ CRUZ; EDGARDO JOSÉ FERNÁNDEZ CRUZ; LISA MARÍA FERNÁNDEZ CRUZ; JAVIER FRANCISCO FERNÁNDEZ CRUZ; WANDAIVELISSE FERNÁNDEZ CRUZ; RICARDO NIEVES-ACEVEDO; CONJUGAL PARTNERSHIP NIEVES-VEGA,

Plaintiffs,

v.

CPC CAROLINA PR, LLC; PUERTO RICO CVS PHARMACY, LLC,

Defendants, Appellees.

KRB UNIVERSAL INVESTMENTS, LLC; INSURANCE COMPANIES A, B AND C; JOHN DOE; JANE DOE,

Defendants.

———————————————

CPC CAROLINA PR, LLC,

Plaintiff,

v.

PUERTO RICO CVS PHARMACY, LLC; CVS PHARMACY, INC.,

Defendants.

———————————

21-1794

EDWARD NIEVES-ROMAN,

Plaintiff, Appellant,

JANET MARIE VEGA-RODRÍGUEZ; MARÍA TERESA CRUZ MARRERO; RAMÓN FERNÁNDEZ CRUZ; EDGARDO JOSÉ FERNÁNDEZ CRUZ; LISA MARÍA FERNÁNDEZ CRUZ; JAVIER FRANCISCO FERNÁNDEZ CRUZ; WANDA IVELISSE FERNÁNDEZ CRUZ; RICARDO NIEVES-ACEVEDO; KHADIJAH AHMAD HAMDALLAH; CONJUGAL PARTNERSHIP NIEVES-VEGA,

Plaintiffs,

v.

CPC CAROLINA PR, LLC; PUERTO RICO CVS PHARMACY, LLC,

Defendants, Appellees,

KRB UNIVERSAL INVESTMENT, LLC; INSURANCE COMPANIES A, B AND C; JOHN DOE; JANE DOE,

Defendants.

———————————————

CPC CAROLINA PR, LLC,

Plaintiff,

v.

PUERTO RICO CVS PHARMACY, LLC; CVS PHARMACY, INC.,

Defendants.

———————————————

No. 21-1795

RICARDO NIEVES-ACEVEDO; JANET MARIE VEGA-RODRÍGUEZ; CONJUGAL PARTNERSHIP NIEVES-VEGA,

Plaintiffs, Appellants,

EDWARD NIEVES-ROMAN; MARÍA TERESA CRUZ MARRERO; RAMÓN FERNÁNDEZ CRUZ; EDGARDO JOSÉ FERNÁNDEZ CRUZ; LISA MARÍA FERNÁNDEZ CRUZ; JAVIER FRANCISCO FERNÁNDEZ CRUZ; WANDA IVELISSE FERNÁNDEZ CRUZ; KHADIJAH AHMAD HAMDALLAH,

Plaintiffs,

v.

CPC CAROLINA PR, LLC; PUERTO RICO CVS PHARMACY, LLC,

Defendants, Appellees,

KRB UNIVERSAL INVESTMENTS, LLC; INSURANCE COMPANIES A, B AND C; JOHNDOE; JANE DOE,

Defendants.

————————————————

CPC CAROLINA PR, LLC,

Plaintiff,

v.

PUERTO RICO CVS PHARMACY, LLC; CVS PHARMACY, INC.,

Defendants.

————————————————

No. 21-1805

MARÍA TERESA CRUZ MARRERO; RAMÓN FERNÁNDEZ CRUZ; EDGARDO JOSÉ FERNÁNDEZ CRUZ; LISA MARÍA FERNÁNDEZ CRUZ; JAVIER FRANCISCO FERNÁNDEZ CRUZ; WANDA IVELISSE FERNÁNDEZ CRUZ,

Plaintiffs, Appellants,

JANET MARIE VEGA-RODRÍGUEZ; EDWARD NIEVES-ROMAN; RICARDO NIEVES-ACEVEDO; CONJUGAL PARTNERSHIP NIEVES-VEGA; KHADIJAH AHMAD HAMDALLAH,

Plaintiffs,

v.

CPC CAROLINA PR, LLC; PUERTO RICO CVS PHARMACY, LLC,

Defendants, Appellees,

CVS PHARMACY, INC.; KRB UNIVERSAL INVESTMENTS, LLC; INSURANCE COMPANIES A, B AND C; JOHN DOE; JANE DOE,

Defendants.

————————————————

CPC CAROLINA PR, LLC,

Plaintiff,

v.

PUERTO RICO CVS PHARMACY, LLC; CVS PHARMACY, INC.,

Defendants.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. William G. Young,* U.S. District Judge]

_____

Before

Kayatta, Lipez, and Thompson,
Circuit Judges.

_____

José Luis Novas Debién for appellants in Nos. 21-1791, 21-1794, and 21-1795.
Jeannette López de Victoria, with whom Oliveras & Ortiz, PSC was on brief, for appellants in 21-1805.
José L. Ramírez-Coll, with whom Carolina V. Cabrera Bou and Antonetti Montalvo & Ramirez Coll were on brief, for appellee CPC Carolina PR, LLC.
Jesus E. Cuza Abdala, with whom Holland & Knight LLP and Rebecca J. Canamero were on brief, for appellee Puerto Rico CVS Pharmacy, LLC.

_____

January 12, 2024

_____

_____

* Of the District of Massachusetts, sitting by designation.

**THOMPSON, <u>Circuit Judge</u>.**

<u>PROLOGUE</u>

These consolidated appeals tell the tale of a commercial real estate deal gone sideways. Certain that a few torts were committed along the way, the Sellers (and owners) of the relevant, individual pieces of land ("the Parcels") sued the would-be purchaser and lessor of the Parcels, CPC Carolina PR, LLC ("CPC"), and the would-be lessee of the Parcels, Puerto Rico CVS Pharmacy, LLC ("CVS"). Unfortunately for the Sellers, they lost on summary judgment at the district court. Undeterred, they brought the case to our bench. We'll provide the remaining details as we go, but we won't bury the lede as to how this story ends: after thoughtful consideration of the parties' arguments (or, at least, what we understand those arguments to be), we affirm the lower court's decision across the board.

<u>SETTING THE (FACTUAL) SCENE[1]</u>

*Chapter 1: The Parcels*

This story opens nearly sixty years ago in Carolina, Puerto Rico. There, on October 16, 1964, a developer encumbered a residential area known as Valle Arriba Heights with certain

_____

[1] Unless otherwise noted, we set the scene with uncontested facts. In any event, we (as always) summarize the facts in the light most agreeable to the Sellers, as they did not move for summary judgment below, and we make "all reasonable inferences in [their] favor, consistent with record support." <u>Johnson</u> v. <u>Johnson</u>, 23 F.4th 136, 139 (1st Cir. 2022) (citation omitted).

restrictive covenants. Pursuant to these pesky restrictive covenants, all properties within Valle Arriba Heights could only be used for residential purposes. Of significance, the Parcels are all located in Valle Arriba Heights and are, thus, subject to these same covenants.

Chapter 2: The Agreements Between the Sellers and CPC

The story picks back up several decades later. On October 3, 2013, the Sellers[2] agreed to sell their respective Parcels to KRB Universal Investments, LLC ("KRB") pursuant to four identical Purchase Agreements ("the Agreements"). Upon acquisition of all the Parcels, KRB would aggregate them into one larger plot of land that would then be developed for commercial use -- a fact to which all the Sellers were privy. KRB later

_____

[2] Two quick notes on the who's who of these consolidated appeals. First, our use of "the Sellers" (both so far and through the "Epilogue") refers collectively to the Appellants in the following consolidated appeals: (1) Hamdallah v. CPC Carolina PR, LLC, 21-1791; (2) Nieves-Roman v. CPC Carolina PR, LLC, 21-1794; (3) Nieves-Acevedo v. CPC Carolina PR, LLC, 21-1795; and (4) Cruz Marrero v. CPC Carolina PR, LLC, 21-1805. And second, to facilitate the telling of this story, we must at certain points identify a particular Seller for clarity, which we will identify as the "Hamdallah Seller," "Nieves-Roman Seller," "Nieves-Acevedo Sellers," and "Cruz Marrero Sellers." Along these same lines, we will at times need to refer collectively to a subset of the Sellers. This will most often be the case for the Hamdallah Seller, Nieves-Roman Seller, and Nieves-Acevedo Sellers because they are represented by the same counsel. We will refer to them collectively as "the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers," and other variations of the Sellers will likewise be referred to in this same format.

assigned its rights under the Agreements to CPC on February 24, 2015.

Several provisions of the Agreements are crucial to this tale's trajectory and are worth introducing now. First, Section 5 of the Agreements provided that the "Closing" "shall [occur] . . . within thirty (30) days after expiration of the Inspection Period." Section 11, in turn, defined the "Inspection Period" as 365 days after the date the Agreements became effective (which was December 11, 2013), subject to any extensions agreed upon by the parties.[3]

The second set of provisions that bears emphasizing relates to the possession, condition, and maintenance of the Parcels through Closing. Pursuant to Section 5, each Parcel was to be conveyed "[a]t Closing" and "[p]ossession of the [Parcel]" was to "be delivered to [CPC] upon Closing." Section 7 provided, in relevant part, that "[c]ommencing upon the date of this Agreement and extending through Closing hereunder, the [Parcel] and title to the [Parcel] shall remain in the same condition as on the date hereof, except, however, for natural wear and tear."

_____

[3] It is worth noting that, according to Section 5, the Closing "shall [occur] . . . within thirty (30) days after expiration of the Inspection Period provided in Section 10," not Section 11. This appears to be a typographical error because Section 10 refers to an "Evaluation Period," not the "Inspection Period," and all parties agree that the Agreements require the Closing to occur within 30 days of the end of the Inspection Period.

Furthermore, according to Section 7, "all risk of loss to the [Parcel] for any casualty or otherwise shall remain upon Seller."

Third, the Agreements provided for an "Earnest Money" deposit of $5,000.00 that would function as liquidated damages:[4]

> If the sale and purchase of the [Parcel] as contemplated by this Agreement is not consummated for any reason other than [CPC]'s default, the Earnest Money and all interest earned thereon, except as herein expressly provided to the contrary, shall be refunded to [CPC] on demand. If the sale and purchase is not consummated because of [CPC]'s default, then Seller shall have the right to retain the Earnest Money and all interest earned thereon, as full liquidated damages for such default of [CPC], the parties hereto acknowledging that it is impossible to more precisely estimate the damages to be suffered by Seller upon [CPC]'s default. The parties expressly acknowledge that retention of the Earnest Money and all interest earned thereon, is intended not as a penalty, but as full liquidated damages. In the event the purchase and sale contemplated in this Agreement is not consummated because of [CPC]'s default, [CPC] hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller to recover the Earnest Money, and all interest earned thereon, or any part thereof on the grounds that it is unreasonable in amount or that its retention by Seller is a penalty and

---

[4] For the reader less well-versed in contract terminology, "[a] liquidated damages clause is one that provides in advance that a breaching defendant will pay a specific amount for a specific breach. The purpose of such a clause is to provide parties with a reasonable predetermined damages amount where actual damages may be difficult to ascertain. At least in theory, such provisions minimize uncertainty and reduce litigation costs, easing the burden on both the parties and the judicial system." John Hancock Life Ins. Co. v. Abbott Lab'ys, 863 F.3d 23, 40 (1st Cir. 2017) (internal citations and quotation marks omitted).

> not agreed upon and reasonable liquidated
> damages.

(emphases ours). In other words, in the event that CPC defaulted and failed to purchase the Parcels, the Sellers would each only be entitled to a maximum of $5,000.00 as damages and could not sue for more. Indeed, the Sellers explicitly agreed to this in the Agreements, which state that the "Seller hereby covenants and agrees not to sue [CPC] for specific performance of this Agreement or for damages other than the liquidated damages set forth above."

Fourth, the Agreements set forth several conditions precedent[5] before CPC's obligation to close on the Parcels came into effect. These conditions precedent included (among other things):

> (b) [CPC] obtaining all necessary and final zoning and governmental permits, Anteproyecto, ARPE Approvals, site plan approvals, tenant approval, access curb cuts, traffic controls, licenses, and approvals, for the site construction and operation of the proposed improvements on the [Parcel] along with any other required and non-appealable government requirements.
>
> . . .
>
> (e) Prime User and Financing Commitments have been received by [CPC].

---

[5] Again, for the reader less well-versed in contract terminology, "[a] condition precedent is 'an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract.'" Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992) (quoting Mass. Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45 (1991)).

. . .

>>(f) No casualty, natural event or condemnation has occurred.[6]

(emphases ours).

And last, but certainly not least, the Agreements also established that CPC could "deliver[] written notice to the Seller on or before [the expiration of the Inspection Period] that [CPC] has determined that the . . . conditions [precedent] are not met, to [CPC's] sole satisfaction . . . in [CPC]'s sole discretion." If CPC delivered such notice, it was "not . . . obligated to close."

*Chapter 3: The Ground Lease Between CPC and CVS*

At the time the Sellers entered into the Agreements in 2013, CVS had not yet entered the picture. Rather, it joins this tale approximately one month after KRB assigned its rights to CPC under the Agreements. On March 30, 2015, CPC and CVS executed a lease ("the Ground Lease"), which would allow CVS to lease the aggregated Parcels and construct and operate a CVS pharmacy.[7]

Several provisions of the Ground Lease, however, gave CVS outs if, in its sole discretion, it was not satisfied with any

---

[6] As will soon become clear, CVS eventually became the "tenant" and "Prime User" referenced in this provision.

[7] The record reflects that only certain Sellers were aware of CVS's lease at this time, but, by 2017, all the Sellers were aware of it.

condition of the Parcels.  For example, the Ground Lease provided CVS with an "Evaluation Period," during which it could "terminate th[e] Lease by written notice to [CPC] . . . if . . . in [CVS's] sole discretion, [CVS was] not satisfied with . . . any other condition relating to the [Parcels], including, without limitation, title, zoning laws, land use laws, or status of permits or approvals."  Even outside of the Evaluation Period, CVS was not "obligated to accept possession of the [Parcels] until [CVS] shall have . . . received a leasehold policy of title insurance with respect to the [Parcels], which policy shall be satisfactory to [CVS]; and . . . received and recorded a Deed of Constitution of Lease pursuant to Section 29 [of the Ground Lease]."

The Ground Lease's Evaluation Period ended on August 26, 2015.  At some point prior to the Evaluation Period's expiration, both CPC and CVS became aware of the restrictive covenants prohibiting non-residential use of the Parcels.

*Chapter 4:  The May/June 2017 Closing Falls Through*

Over the ensuing years, the Sellers and CPC agreed to several extensions of the Agreements' Inspection Period -- thereby also extending the Closing date.  That all seemed to change on April 17, 2017, when CPC's attorney, Loyda Rivera ("Rivera"), informed the Sellers by letter that the Closing had been set for May 19, 2017.  This letter requested that each Seller make arrangements to terminate any operations on or leases of their

respective Parcel and to remove therefrom any equipment or occupants, "by or before May 19th."[8]

Rivera followed up via letter dated May 16, 2017, informing the Sellers that the Closing had been moved and would now occur sometime between May 31 and June 5, 2017. This letter, like the first one, requested that the Sellers vacate the Parcels (this time though) "by or before May 31st."[9] May 31, however, came and went with no Closing. In the end, the Closing did not take place in May or June 2017 because a seller (not one of the Sellers in these consolidated appeals) failed to disclose that a member of that seller's estate was a minor, therefore requiring court approval of the transaction ("Minor's Title Issue").[10]

In response to this blip -- one which all the Sellers were aware of -- the Sellers agreed to a final extension of the

---

[8] At the time, the Nieves-Acevedo Sellers leased the rooftop of their Parcel to a third-party for the use of antennas. Rivera's April 17, 2017 letter requested that the Nieves-Acevedo Sellers terminate this contract and remove any related equipment "on or before May 19th."

[9] Rivera's May 16, 2017 letter to the Nieves-Acevedo Sellers uses slightly different language, "on or before May 31st."

[10] In response to Rivera's letters, the Hamdallah/Cruz Marrero Sellers vacated their respective Parcels in May 2017 and did not re-occupy them following the May/June 2017 Closing failing to occur due to the Minor's Title Issue. The Nieves-Roman/Nieves-Acevedo Sellers did not vacate their respective Parcels at this time. None of the Sellers, however, gave CPC the keys to their respective Parcels at this time (or at any other time).

Inspection Period to October 30, 2017, thereby once again extending the Closing date.

*Chapter 5:  Cancellation of the Closing*

In the wake of the failed May/June Closing, a flurry of events brings this tale to its climax:  the cancellation of the Closing altogether.

After vacating her Parcel in response to Rivera's letters, the Hamdallah Seller returned to it several times between June and August 2017 to check on the premises -- only to find that her Parcel had been vandalized.  Troubled by her discovery and concerned about further vandalism, the Hamdallah Seller contacted Rivera in June to request that a security guard be placed at the Parcel, to which Rivera responded that there was no need for a security guard because the Parcels would be demolished.

Also in June 2017, an electrical transformer that provided power to the Parcels was removed.  There's disagreement among the Sellers and CVS as to the circumstances surrounding the removal of the transformer, with the Sellers stating that it was removed upon CVS's request to the Autoridad de Energía Eléctrica de Puerto Rico ("AEE") and CVS stating it made no such request and had no involvement whatsoever in its removal.  Regardless, everyone

agrees that the Sellers did not look into the transformer's removal at this time.[11]

At some point prior to August 2017, CVS's outside engineer, Carlos Sanchez ("Sanchez"), posted signage on the Parcels that stated (among other things) CVS was the owner of the Parcels. These signs were posted in accordance with and as required by local municipal regulations.

With these (what will later prove to be) important plot points squared away, this story reaches the pivotal month of August 2017. On August 4, Rivera informed the Sellers by letter that the Closing had been scheduled for August 14, 2017 at her office. This letter noted that an inspection would occur on August 13 and, like all the letters before it, requested that the Sellers completely vacate the Parcels by that date. The Closing was moved shortly thereafter to August 16, 2017.

On August 9, Arnaldo Villamil ("Villamil"), CVS's attorney for this transaction, received from Popular Insurance, a title insurance company, a draft insurance policy that excluded from coverage claims relating to the enforcement of the restrictive

---

[11] In fact, the record shows that the first inquiry on the part of any of the Sellers occurred in May 2018, when the Nieves-Acevedo Sellers, through their electrician, contacted the AEE to reinstall the power to the Parcels. According to the Nieves-Acevedo Sellers, their electrician was told by an unidentified person at the AEE that CVS had requested the removal of the transformer. Of course, as mentioned above, CVS flatly denies this allegation and provides some record support for its denial.

covenants. Accordingly, Villamil, on behalf of CVS, notified Rivera the following day that CVS would not accept the Parcels, relying on the Ground Lease provision that stated CVS was not obligated to accept possession of the Parcels if it did not receive a satisfactory insurance policy. The August 13 inspection of the Parcels, nevertheless, proceeded as originally planned, with Rivera, Sanchez, and Villamil all in attendance. And the last two holdouts to vacate the Parcels -- the Nieves-Roman/Nieves-Acevedo Sellers -- finally vacated by August 14.[12]

Two days later, the long-awaited August 16 Closing finally arrived. That morning, though, CVS informed CPC that it was backing out of the transaction because of the non-satisfactory insurance policy and the restrictive covenants. In the dark about these goings-on between CVS and CPC, the Sellers arrived, as instructed, to Rivera's office for the Closing, where she ultimately informed the Sellers that the Closing would not take place due to an issue between CVS and CPC.

Everything came to a head on August 25, 2017, when Rivera sent a letter ("the August 25, 2017 Letter"), the full contents of

---

[12] At some point after this, the Parcels belonging to the Nieves-Roman/Nieves-Acevedo/Cruz Marrero Sellers were vandalized.

which is reproduced below, informing the Sellers that CVS had backed out of the deal:[13]

> Many of you have contacted me asking about the status of the [C]losing on the [Parcels] in question. As you all know, on August 16, 2017 we had to stop the [C]losing because CVS informed us that it was not ready to sign the deed instrument containing the lease contract at that time nor to accept delivery of the [Parcels]. Since it was crucial to my client's purchase that the lease contract be signed and the [Parcels] be transferred, the [C]losing was stopped.
>
> As you know, from the time negotiations with you began, this transaction was structured so that the purchase of all nine [Parcels], consolidation of the [Parcels], signing of the lease contract and delivery of the [Parcels] would occur simultaneously. This process was explained to you from the start, as negotiated with CVS.
>
> Around the end of April this year, and then formally in mid-May, my client notified all of you of his intention to close at the end of that month. However, after the [C]losing notice was issued, we learned that one of you had concealed a succession involving minor children as heirs. The discovery of that information required us to suspend the [C]losing scheduled for late May in order to obtain judicial authorization to purchase the affected [Parcel], as required by law. As my client was unable to fulfill its obligation to close and transfer the [Parcels] as agreed in the contract with CVS, CVS notified my client of its refusal to extend delivery of the [Parcels], and the contract was terminated on July 5, 2017.

---

[13] Note, gentle reader, that the August 25, 2017 Letter was sent prior to the expiration of the Agreements' Inspection Period, which was extended to October 30, 2017.

After several negotiations with CVS we (i) helped the seller obtain proper judicial authorization and (ii) convinced CVS to extend the [Parcel] delivery date until August 17 this year.  Once the sale was authorized by the Court, we prepared for the [C]losing, notifying you of a new [C]losing date.

On Thursday August 10, just two (2) working days before the scheduled [C]losing date of August 14, CVS informed us that it needed time to review an issue related to restrictive conditions affecting the [Parcels] in the Registry.  They knew that these conditions had affected the [Parcels] since it was developed in 1964 and that all the title searches reviewed and approved by CVS reflected the same.  These restrictive conditions were never a matter of concern for CVS, which had plenty of time to inform us since signing the [Ground Lease] in 2015 if they had been concerned about them.  In good faith, and to give them time to evaluate this issue, we postponed the original [C]losing date of August 14 to Wednesday August 16, one day before the deadline given by CVS for delivery of the [Parcels].  It should be noted that CVS inspected the [Parcels] on Sunday August 13 and found [them] in satisfactory condition for delivery.

On Wednesday August 16, at approximately 11:30 am, I was instructed to halt the [C]losing.  The reason for this was that CVS notified that it would not be issuing the lease agreement, nor accepting delivery of the [Parcels], because it was not satisfied with the lease insurance policy that it would receive from its insurer at [C]losing, which had excluded the restrictive conditions from the coverage.  The deadline for our client to deliver the [Parcels] was the next day, Thursday August 17.  Therefore, on August 16 and also on August 17, we requested in good faith that the date for [C]losing on and delivering the [Parcels] be extended to give CVS time to review the matter, a request they

- 17 -

> refused. We had no other option than to notify
> CVS of its breach of contract on August 17.
>
> On August 22, 2017, CVS replied that it
> was my client and not CVS that had breached
> the [Ground Lease] by not "purchasing and
> trying to deliver" the [Parcels]. However,
> the agreement was always to purchase,
> consolidate, sign the lease contract, and
> deliver and receive the letter of transfer at
> [C]losing.
>
> My client is exploring all options at
> this time, including hiring litigation
> attorneys to handle the matter from now on.
> As soon as we have more news, we will inform
> you.

(emphases ours).

### Chapter 6: The Aftermath

Following receipt of the August 25, 2017 Letter, the Sellers, expecting the transaction to eventually take place, called Rivera "all the time" to inquire about the status of the Closing. There is conflicting evidence on the Sellers' expectation that the Closing would still occur. For example, Rivera testified during her deposition to the following:

> Uff! [The Sellers] used to call me all the time, even after this [August 25, 2017 Letter]. "Do you have any notice? Do you know what's going on?", and I said, "Well, you know, as I told you in the . . . [August 25, 2017 Letter] the deal fell through. CVS didn't want to sign the lease. I know that CPC is trying to, you know, w[eigh] [its] options." You know, they still want to close. And that was it.

- 18 -

On the other hand, the Hamdallah Seller testified at her deposition that, following the failed Closing, Rivera told her that Rivera was waiting for the issue to be resolved. The Nieves-Roman Seller also testified at his deposition that, some days after the Closing, he called and asked Rivera when the Closing would take place, to which she responded, "[S]he was dealing with the papers, she was talking to . . . CPC and she [would] notify [them]," and that was the only time he spoke with Rivera after the August 25, 2017 Letter.[14]

Jumping ahead several months to May 2018: the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers sent CPC an extrajudicial claim letter on May 18, requesting damages for CPC's alleged negligent and tortious behavior during the transaction, up through the failed Closing.[15] Three days later, on May 21, 2018, the Municipality of Carolina ("the Municipality"), owner of a road that was also to be acquired as part of this transaction, wrote to Rivera to inquire about "the status of the" Closing, because it had "not received any communication whatsoever from [CPC]" and it had "received information that the" Closing would not occur. CPC responded to both the Hamdallah/Nieves-Roman/Nieves-Acevedo

---

[14] We take a beat here to also note that, in the weeks following the August 25, 2017 Letter, Puerto Rico was hit by two serious hurricanes, Hurricane Irma and Hurricane Maria.

[15] The Cruz Marrero Sellers sent CPC their own extrajudicial claim letter months later on August 14, 2018.

Sellers and the Municipality on June 7, 2018. It informed the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers that, on August 25, 2017, they "were notified by . . . Rivera that, for reasons not attributable to CPC, . . . the [C]losing . . . would not occur" and that CPC did not "have any duties or obligations in connection with [their Parcels]."[16] And, as for the Municipality, CPC informed it that, "for reasons not attributable to CPC, the construction of the CVS pharmacy . . . [would] not be carried out."

**SETTING THE (PROCEDURAL) SCENE**

*Chapter 7: The Lawsuits*

Needless to say, with CVS's eleventh-hour back-out, neither CPC nor the Sellers left this failed transaction particularly content with its outcome. Accordingly, both CPC and the Sellers decided to take legal action, but the first to make a move was CPC. On August 8, 2018, CPC filed a complaint against CVS ("the Lead Case").[17] Many months later, on April 1, 2019,

---

[16] CPC responded to the Cruz Marrero Sellers' August 14, 2018 extrajudicial claim letter on August 21, 2018, denying all liability.

[17] We pause here to quickly note that these consolidated appeals arise under our diversity jurisdiction, so we apply the substantive law of the local jurisdiction. Baum-Holland v. Hilton El Con Mgmt., LLC, 964 F.3d 77, 87 (1st Cir. 2020). In these consolidated appeals, that local jurisdiction is Puerto Rico, so we apply Puerto Rico's substantive law to our review of both CPC's and CVS's motions for summary judgment against the Sellers. Id. (applying Puerto Rico substantive law under diversity jurisdiction).

- 20 -

the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers each followed up with their own lawsuit against CPC and CVS, asserting negligence claims and seeking damages. Determined not to be left out of these legal skirmishes, the Cruz Marrero Sellers filed their own lawsuit on August 13, 2019, asserting, like the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers, negligence claims and seeking damages from CPC and CVS. And by October 1, 2019, all the Sellers' cases were consolidated with the Lead Case.

*Chapter 8: The Lead Case Settles*

Convinced of the other's fault for the failed Closing, CPC and CVS filed cross-motions for summary judgment against each other on June 8, 2020. On this date as well, both CPC and CVS filed motions for summary judgment against each of the Sellers. After giving everyone an opportunity to respond (both in writing and at oral argument), the district court, on September 30, 2020, issued a decision only in the Lead Case, choosing to put on hold CPC's and CVS's motions for summary judgment against the Sellers until the Lead Case was fully resolved. CPC Carolina PR, LLC v. P.R. CVS Pharmacy, LLC, 494 F. Supp. 3d 144, 157 (D.P.R. 2020). In short, the district court denied summary judgment as to the vast majority of claims CPC and CVS raised against each other, concluding that there were genuinely disputed issues of material

facts (more on what this legal standard means later) regarding the reasons behind the Closing's failure.[18]  Id. at 152–57.

After several scheduling hiccups, the Lead Case was set for a bench trial on January 25, 2021.  But on the eve of trial, CPC and CVS reached a settlement agreement, and the Lead Case was dismissed by March 5, 2021.

Chapter 9:  The Sellers' Summary-Judgment Loss and Appeal

With the Lead Case now resolved, the district court turned its attention back to the pending motions for summary judgment against the Sellers.  After hearing additional oral argument and receiving additional briefing, the district court issued a decision on August 20, 2021, granting CPC's and CVS's respective motions for summary judgment against all the Sellers

---

[18] We won't get into the nitty gritty of this decision, but we will presume the reader's familiarity with the facts found and conclusions drawn in this decision for the remainder of this story. For our less enterprising readers, though, we highlight certain facts found by the district court, namely that (1) "[i]n July 2015, the business environment in Puerto Rico became less favorable to CVS, and the outlook for the [CVS pharmacy] less profitable. Between November 2016 and March 2017, CVS decided to pull out of all Puerto Rico deals, subject to legal approval, when recommended by senior management;" and (2) by late-June 2017, "CVS was taking steps to extract itself from the [Ground Lease]." CPC Carolina PR, LLC, 494 F. Supp. 3d at 148-49.  We mention these factual findings not because we review them here (we have no occasion to do so as the district court's decision in that case was not appealed to us and the parties in these consolidated appeals did not raise these facts in their statements of undisputed facts). Rather, we mention these factual findings as a general heads-up to the reader that the Sellers make some arguments down the line which rely upon these findings.

and dismissing the consolidated cases.  More specifically, as to CPC, the district court concluded that the Sellers could not raise negligence claims against CPC because a valid contract existed between them and their claims against CPC arose exclusively out of the Agreements.  And, as to CVS, the district court concluded that the Sellers' lawsuits were too little, too late because their negligence claims were time-barred by the relevant statute of limitations.

The Sellers (as the reader might have guessed by now) timely appealed their summary-judgment loss.

## THE MAIN ACT

Up top we gave a sneak peek as to this story's end -- namely, with an affirmance of the district court's judgment in favor of CPC and CVS.  Our resolution of the issues on appeal follows and explains how our story reaches that particular end. We first, however, make a brief pitstop to explain our standard of review.

### *Chapter 10:  Standard of Review*

We review the district court's summary-judgment decision *de novo*, which, for those unfamiliar with Latin, simply means that we give the decision a completely fresh look.  Delgado-Caraballo v. Hosp. Pavía Hato Rey, Inc., 889 F.3d 30, 34 (1st Cir. 2018). In doing so, we "ask[] whether the summary-judgment winners (here, [CPC and CVS]) are entitled to judgment as a matter of law because

there is no genuine dispute as to any material fact -- even after taking all facts and inferences in the light most flattering to the summary-judgment losers (here, [the Sellers])," as the parties responding to the motions for summary judgment.  Id. at 34-35 (internal citations and quotation marks omitted).  A genuine dispute is one where "the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a material fact is, as the name suggests, a fact that "has the potential of affecting the outcome of the case."  Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (internal citations and quotation marks omitted).  While CPC and CVS have the initial burden as the moving parties, the Sellers cannot just rest on their laurels, meaning that they must present "specific facts showing that a trier of fact could reasonably find in [their] favor."  Johnson, 23 F.4th at 141 (citation and internal quotation marks omitted).  To do so, the Sellers must be careful not to "rely on conclusory allegations, improbable inferences, and unsupported speculation" -- all of which don't make the cut on summary judgment.  Id. (citation and internal quotation marks omitted).

*Chapter 11:  CPC's Motions for Summary Judgment Against the Sellers*

With this standard of review at top of mind, we turn first to CPC's motions for summary judgment against the Sellers.

As we previewed above, the Sellers raise various negligence claims against CPC, all under Article 1802 of Puerto Rico's Civil Code, 31 P.R. Laws Ann. § 5141. Article 1802 is Puerto Rico's negligence statute and provides, in relevant part, that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31 P.R. Laws Ann. § 5141. And the Sellers contend several of CPC's actions (which we'll describe in detail in just a moment) amount to negligence that caused them damages. There is, nevertheless, a small wrinkle in their plan, because, as CPC points out, Article 1802 "does not apply in the context of a commercial transaction," Isla Nena Air Servs. v. Cessna Aircraft Co., 449 F.3d 85, 88 (1st Cir. 2006) (quoting Betancourt v. W.D. Schock Corp., 907 F.2d 1251, 1255 (1st Cir. 1990)), and here there is no dispute that the Sellers and CPC were involved in a commercial transaction under the Agreements.

No matter, say the Sellers, because they have the Puerto Rico Supreme Court's decision in Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 1992 WL 755597 (P.R. 1992), in their back pocket, which they argue controls here. There, a lessee's negligence resulted in a fire, which destroyed the leased property. In an attempt to sidestep the one-year statute of limitations under Article 1802, "[t]he lessor sued under a theory of breach of contract (the lease agreement), which had a longer

- 25 -

statute of limitations," but the trial court applied Article 1802's statute of limitations "because the lessor's theory was that the fire was the result of the lessee's negligence" (making the claim one based squarely on negligence and not contract) and dismissed the lawsuit.  Isla Nena Air Servs., 449 F.3d at 89-90.

The Puerto Rico Supreme Court was unconvinced, as it held "that a claim for noncontractual damages resulting from the breach of a contract lies if the act that caused the damage constitutes a breach of the general duty not to injure anyone and, at the same time, a breach of contract."  Ramos Lozada, 130 D.P.R. 712, 1992 WL 755597.  According to the Puerto Rico Supreme Court, a plaintiff can choose whether to bring a contract-based or torts-based lawsuit (but not both) if certain conditions were met:

> 1. The event that caused the damage must be, at the same time, a breach of a contractual obligation and a violation of the general duty not to cause harm to another; that is, the breach of a duty, abstractedly from the contractual obligation that would arise even if it had not existed.
>
> 2. The person aggrieved as a result of the double (contractual and delictual) violation must be the same person, that is, the contractual creditor.
>
> [. . .]
>
> 3. Finally, the double violation must also have been committed by the same person, the contractual debtor [. . . .]  It is not a matter of claiming two liabilities in any case, but of choosing between actions that pursue the same end.

- 26 -

Id.

Put plainly, under Puerto Rico law, "[a] plaintiff may bring a negligence claim based on a contractual relationship when there is both an alleged breach of contract and an alleged breach of the general duty not to negligently cause injury."[19] Nieves Domenech v. Dymax Corp., 952 F. Supp. 57, 65-66 (D.P.R. 1996) (citing Ramos Lozada, 130 D.P.R. 712, 1992 WL 755597). Heeding the Puerto Rico Supreme Court's warning, though, the general duty not to negligently cause injury "must arise out of conditions separate from the parties' contract," because "[i]f a plaintiff's damages arise exclusively from a defendant's alleged breach of contract, the plaintiff does not have a separate cause of action for negligence." Id. at 66 (citing Ramos Lozada, 130 D.P.R. 712, 1992 WL 755597).

Applying Ramos Lozada here means that, to avoid a summary-judgment loss, the Sellers must demonstrate that at least one of CPC's alleged negligent actions here was (among other things, but most relevant to our purposes today) a breach of the general duty not to negligently cause harm or injury, and that any such duty would have arisen even if the Agreements did not exist. As we understand it, the Sellers argue CPC committed four negligent

---

[19] We don't decide whether this is the only scenario in which a plaintiff may bring a negligence claim.

- 27 -

acts that satisfy Ramos Lozada's requirements: (1) CPC induced the Sellers into an impossible contract; (2) CPC failed to timely take action to cancel the restrictive covenants or, alternatively, cancel the Agreements, and therefore induced the Sellers into believing the Closing would occur; (3) CPC required the Sellers to prematurely vacate the Parcels, leaving them particularly susceptible to vandalism; and (4) CPC told the Sellers there was no need to safeguard the Parcels, as they would be demolished.[20]

We'll address each alleged act in turn.

*Chapter 11.A: Inducing the Sellers into an Impossible Contract*

In the minds of the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers, they were induced by CPC into the Agreements, which could never have come to fruition because of the restrictive covenants (but nowhere do they explain how exactly CPC induced them into the Agreements). This act of inducing them into the Agreements -- the argument goes -- satisfies Ramos Lozada's requirements and, therefore, summary judgment against them was inappropriate.[21] We can give this argument short shrift because the record does not support the idea that CPC induced any of the

_____

[20] At the outset, we note that not every Seller properly raised each of these acts in their briefing to us, which (as we will discuss below) means that the Sellers who did not do so waive any arguments regarding them.

[21] The Cruz Marrero Sellers did not raise this argument in their briefing to us and so we deem it waived as to them. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Sellers into the Agreements.  To be sure, CPC did not enter the picture until almost two years after the Agreements were signed with KRB (because KRB later assigned its rights under the Agreements to CPC),[22] and no facts suggest that CPC was involved in the original negotiations between the Sellers and KRB.

*Chapter 11.B:  Failing to Cancel the Restrictive Covenants and/or the Agreements*

The second alleged negligent act requires a bit more analysis.  The Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers seem to argue that CPC failed to timely address the restrictive covenants, either by having them fully cancelled or by cancelling the Agreements altogether.  Despite knowing about the existence of these restrictive covenants and their potential effect on CVS's planned use of the land, CPC did nothing to address the deed restrictions and induced the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers into believing that the Closing would (and indeed could) occur, in spite of them.  According to them, CPC's failure "to cancel the covenants, or, if not possible or practicable,

---

[22] There's also not even a whiff of an argument in the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers' briefing that KRB tortiously induced them into the Agreements and that CPC was somehow in privity with KRB or its successor in interest, such that any actions taken by KRB should be ascribed to CPC.

timely desist[] of the project" satisfies Ramos Lozada's requirements.[23] We don't see it that way, and here's why.

Even were we to assume that CPC's failure to timely cancel the restrictive covenants and/or the Agreements constituted a breach of duty, we are left puzzled as to how this duty and its breach "would [have] arise[n] even if [the Agreements] had not existed." Ramos Lozada, 130 D.P.R. 712, 1992 WL 755597. Indeed, without the Agreements, CPC would have had no connection or obligations whatsoever to the Parcels or the Sellers. In the same vein, we are left equally puzzled as to how the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers would have suffered damages based on the title defects without the Agreements. See Isla Nena Air Servs., 449 F.3d at 90-91 (concluding Ramos Lozada did not apply because "the damages would not have occurred without the existence of a contract"); Nieves Domenech, 952 F. Supp. at 66 ("If a plaintiff's damages arise exclusively from a defendant's alleged breach of contract, the plaintiff does not have a separate cause of action for negligence."). And without any argumentation from the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers on this point,[24]

---

[23] As before, the Cruz Marrero Sellers did not raise this argument in their briefing to us and so we deem it waived as to them.

[24] The only argumentation the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers make as to this particular Ramos Lozada requirement is in reference to CPC's alleged inducement of the Sellers into

- 30 -

we simply cannot conclude that CPC's alleged failure to timely cancel the restrictive covenants and/or the Agreements satisfies Ramos Lozada's requirements.

*Chapter 11.C:  Requiring the Sellers to Vacate the Parcels Prematurely*

Third in line for our review is the Sellers' contention that CPC allegedly forced them to prematurely vacate the Parcels, leaving them at a heightened risk for vandalism.  And here's the rundown of that argument from the Sellers' point-of-view:  Rivera required that the Sellers vacate the Parcels in April 2017 for a May 2017 Closing that would never occur; this request to prematurely vacate the Parcels violated Section 5 of the Agreements, which required that possession of the Parcels be delivered at Closing free of occupants and equipment; and by complying with CPC's request to vacate and leave the Parcels vacant, they became prone to vandalism.  We find, though, that the Sellers' view of these events and their theory of CPC's negligence are completely belied by the record.

To start off, there is no support in the record for the proposition that Rivera "require[d] that the [S]ellers physically vacate the property together with their furnishings and belongings, [two months] in advance of the [C]losing."  While it

_____

the Agreements and to CPC's alleged requiring of the Sellers to vacate the Parcels prematurely.

is true that she sent a letter on April 17, 2017 requesting that the Sellers vacate the Parcels, the letter stated explicitly that this was to be done "by or before May 19th," the anticipated date, at that time, that the Closing would occur. This letter hardly required the Sellers to vacate the Parcels "two months prior" to the Closing. The same is true for the letter Rivera sent on May 16, 2017 moving the Closing to sometime between May 31 and June 5, 2017, because that letter similarly required that the Sellers vacate the Parcels "by or before May 31st."

The Sellers also say that Rivera's request to prematurely vacate the Parcels resulted in "the entire block bec[oming] vacant at the same time" and becoming "besieged by vandalism, squatters, and theft of fixtures, among others." As we noted above, however, the block did not become vacant at the same time because the Nieves-Roman/Nieves-Acevedo Sellers did not end up vacating their Parcels until mid-August 2017.

Neither does the record support the Sellers' theory that CPC acted tortiously when it directed them to vacate their Parcels for a Closing that never happened. As the Sellers tell it, CPC knew or should have known that an eventual Closing would be impossible given the existence of the restrictive covenants. By failing to communicate this detail to the Sellers and requiring them to vacate their Parcels regardless, CPC negligently

misrepresented relevant information on which the Sellers relied to their detriment.

But regardless of whether this theory of harm satisfies the Ramos Lozada requirements, there are several, record-related problems in the Sellers' theory, to which they seem to be turning a blind eye. While the evidence shows that CPC knew CVS may not be able to obtain satisfactory title insurance because of the restrictive covenants, it does not indicate that CPC knew with absolute certainty that a Closing would not take place, when it requested that the Sellers vacate their Parcels. Rivera, for example, testified that even after the August 25, 2017 Letter explaining to the Sellers that CVS was definitively out of the deal, CPC "[was] trying to, you know, w[eigh] [its] options. You know, they still want to close." Similarly, when CPC filed the Lead Case a year later, one of the remedies it sought was specific performance of the Ground Lease, which also would have resulted in a successful Closing.

This all means that the Sellers cannot demonstrate that CPC misrepresented any relevant information to them when it directed them at various points throughout the summer of 2017 to vacate their Parcels in anticipation of the Closing that CPC always thought would occur. As far as the record shows, CPC was still hopeful that the Closing would take place. It therefore did not violate any duty of care owed to the Sellers when it, in accordance

with the terms of the Agreements, instructed them to vacate their Parcels ahead of the anticipated Closing date(s).  And in the absence of any factual support, the Sellers' theory fails.

*Chapter 11.D:  Telling the Sellers Security Was Unnecessary*

Not to be outdone, the Cruz Marrero Sellers have one more argument.  They argue that, under Ramos Lozada, they have a valid negligence claim because, in June 2017, CPC "induced [the Cruz Marrero Sellers] [in]to believ[ing] that they had no need to physically safeguard [their Parcel]," when Rivera told the Hamdallah Seller that there was no need to safeguard the Parcels because all the structures were to be razed.[25]  Color us unpersuaded for several reasons.

First, the record does not support the proposition that Rivera induced the Cruz Marrero Sellers into deciding not to physically safeguard their Parcel.  As an initial matter, the Hamdallah Seller (not the Cruz Marrero Sellers) made the request in June 2017 to Rivera for the security guard.  Nothing in the record suggests that the Cruz Marrero Sellers also made a similar request, that they were present when the Hamdallah Seller made her

_____

[25]  While the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers mention the Hamdallah Seller's request for a security guard in the procedural history and facts section of their opening brief, they offer no actual argumentation on this point, which means it is waived as to them.  Zannino, 895 F.2d at 17.  In their reply brief, they offer some argumentation but, as we've said time and time again, "arguments not made in an opening brief on appeal are deemed waived."  Brox v. Hole, 83 F.4th 87, 97 n.2 (1st Cir. 2023).

request, that the Hamdallah Seller informed them of Rivera's response, or that the Cruz Marrero Sellers changed their behavior in any way in reliance on Rivera's statement. Indeed, the Hamdallah Seller's request to Rivera is not even mentioned in either of the Cruz Marrero Sellers' statements of undisputed material facts. This all makes good sense because another record dig on our part shows that the only Parcel that was vandalized in June 2017 was the Hamdallah Seller's. Per their own admission, the Cruz Marrero Sellers' Parcel was not vandalized until sometime after mid-August 2017.

Second, even if there was adequate record support for the Cruz Marrero Sellers' version of events, their argument fails on the merits. Nowhere in their opening brief do they explain in any way how Rivera's actions here satisfy Ramos Lozada's requirement that the duty not to cause harm would have arisen even if the Agreements had not existed. At this stage in litigation, we cannot simply rely on the Cruz Marrero Sellers' nebulous say-so and the lack of actual evidence means that their negligence claim cannot proceed.

To sum up, the Sellers collectively proffer several alleged negligent acts on CPC's part, but they either lack record support, do not meet Ramos Lozada's requirements, or both.

Accordingly, the district court was right to grant CPC's motions for summary judgment against the Sellers.[26]

*Chapter 12: CVS's Motions for Summary Judgment Against the Sellers*

And with that, this story reaches its final chapter, where we address CVS's motions for summary judgment against the Sellers.

As they did with CPC, the Sellers raise Article-1802 negligence claims against CVS, but their theories of negligence differ somewhat from those they proposed against CPC. While not a beacon of clarity, the Sellers appear to renew the two theories of CVS's negligence that they raised below: (1) CVS acted negligently when it removed the transformer and placed signage at the Parcels, leaving the Parcels particularly vulnerable to vandalism; and (2) CVS acted negligently by failing to terminate the Ground Lease upon learning of the restrictive covenants and by

---

[26] There's one stray argument left for us to address before turning to CVS's motions for summary judgment against the Sellers. The Sellers take issue with certain statements made by the district court in granting summary judgment to CPC. Specifically, the district court stated that "[w]hile a close call, the Sellers' arguments are misplaced: their tort claims fail against CPC . . . because the damages are, ultimately, a result of the failure of the parties to Close under the Agreements." (emphasis ours). According to the Sellers, the "while a close call" statement and others like it suggest that the district court improperly engaged in credibility determinations and did not otherwise follow the proper summary judgment standard. We don't agree that the district court erred in this way but, even if it did, our review is *de novo* and we employ the correct summary judgment standard.

waiting until August 2017 to refuse to accept possession of the Parcels, thereby inducing the Sellers into believing the Closing would occur and into vacating the Parcels. CVS argues that the Sellers' theories fail on multiple grounds, but we need not address all of them. Rather, as we will show, resolution of the Sellers' claims against CVS depends entirely on whether the Sellers satisfied Article 1802's one-year statute of limitations. Tokyo Marine & Fire Ins. Co. v. Perez & Cia. de P.R., Inc., 142 F.3d 1, 3 (1st Cir. 1998) ("Tort claims under [A]rticle 1802 are subject to the one-year statute of limitations provided by [A]rticle 1868(2) of the Civil Code." (citing 31 P.R. Laws Ann. § 5298(2))). (Hint, hint, they did not.)

Let's start by laying out the appropriate framework for this statute-of-limitations analysis. Under Puerto Rico law, this one-year clock starts ticking when the injured party has knowledge "of the injury and of the likely identity of the tortfeasor." Id. And two types of knowledge can trigger the ticking of the clock: actual knowledge and deemed knowledge. Alejandro-Ortiz v. P.R. Elec. Power Auth., 756 F.3d 23, 27 (1st Cir. 2014). Actual knowledge is rather self-explanatory. It "occurs when a plaintiff is aware of all the necessary facts and the existence of a likelihood of a legal cause of action." Id. (citation and internal quotation marks omitted).

Deemed knowledge, on the other hand, requires a bit more explanation. It is "an objective inquiry where the plaintiff, while not having actual knowledge, is deemed to be on notice of her cause of action if she is aware of certain facts that, with the exercise of due diligence, should lead her to acquire actual knowledge of her cause of action." Id. Under this "deemed knowledge" standard, "[o]nce a plaintiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run." Rodríguez-Surís v. Montesinos, 123 F.3d 10, 16 (1st Cir. 1997). "In other words, the statute of limitations begins running at the time a reasonably diligent person would discover sufficient facts to allow her to realize that she'd been injured and to identify the party responsible for that injury. The rationale being, of course, that once a plaintiff comes into such knowledge, she can file suit against the tortfeasor." Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 216 (1st Cir. 2016).

Reasonable diligence "is usually a jury question . . . so long as the outcome is within the range where reasonable men and women can differ." Villarini-Garcia v. Hosp. del Maestro, 8 F.3d 81, 86-87 (1st Cir. 1993) (internal citations and quotation marks omitted). That's not necessarily always the case, though,

because the court may "determin[e] that the evidence of record is so one-sided as to compel a finding . . . that the plaintiff was aware of enough facts to constitute notice and to satisfy the deemed knowledge rule of the Puerto Rico law of limitation of tort actions." Rodríguez-Surís, 123 F.3d at 14.

Putting everything together, this all means that the one-year statute of limitations begins to run "when the injured party knew or should have known of the injury and of the likely identity of the tortfeasor." Tokyo Marine & Fire Ins. Co., 142 F.3d at 3 (emphasis ours). And, normally, the burden of a statute-of-limitations defense lies with the defendant. Rivera-Carrasquillo, 812 F.3d at 216. But that normal burden allocation goes out the window and shifts to the plaintiff when they "sue[] more than one year after the date of injury." Id. "If this burden is not met the statute of limitations will then start to run from the day of the injury regardless of whether or not there is actual knowledge." Fragoso de Conway v. Lopez, 794 F. Supp. 49, 51 (D.P.R. 1992), aff'd, 991 F.2d 878 (1st Cir. 1993).

Applying this statute-of-limitations framework to the facts here, there are a few things that are clear right out of the gate. First, we know that the injuries caused by CVS's alleged negligence all occurred by the end of summer 2017: (1) the transformer was removed in June; (2) the signage was posted by

Sanchez at some point before August;[27] and (3) CVS backed out of the Ground Lease because of the restrictive covenants and unsatisfactory insurance policy in August. Second, the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers initiated their lawsuits on April 1, 2019 and the Cruz Marrero Sellers initiated theirs on August 13, 2019. And third, because all the Sellers sued more than one year after the end of August 2017, they "bear[] the burden of proving that [they] lacked the requisite knowledge at the relevant times." Rivera-Carrasquillo, 812 F.3d at 216 (citation and internal quotation marks omitted).

So, in light of all this, the operative question is whether the Sellers can shoulder their burden that they did not have the requisite knowledge of their injuries and CVS's identity prior to one year before they filed their lawsuits. CVS argues that the Sellers cannot meet their burden because they received actual or deemed knowledge of their injuries and CVS's identity through Rivera's August 25, 2017 Letter -- an argument which the district court accepted. Upon review of the record and the parties' arguments, we agree with CVS and the district court.

A simple onceover of the August 25, 2017 Letter (which all the Sellers concede they received) explains why. That letter

---

[27] The vandalism, which, in the Sellers' minds, was caused in part by the removal of the transformer and the posting of the signage, also occurred in the summer of 2017.

informed the Sellers that (1) CVS backed out of the Ground Lease and refused to grant an extension to CPC to deal with the restrictive-covenants issue:

> CVS notified that it would not be issuing the lease agreement, nor accepting delivery of the [Parcels], because it was not satisfied with the lease insurance policy that it would receive from its insurer at [C]losing, which had excluded the restrictive conditions from the coverage. . . . [W]e requested in good faith that the date for [C]losing on and delivering the [Parcels] be extended to give CVS time to review the matter, a request they refused;

(2) CVS knew of the restrictive covenants for years and did nothing about them:

> CVS informed us that it needed time to review an issue related to restrictive conditions affecting the [Parcels] in the Registry. They knew that these conditions had affected the [Parcels] since [they were] developed in 1964 and that all the title searches reviewed and approved by CVS reflected the same. These restrictive conditions were never a matter of concern for CVS, which had plenty of time to inform us since signing the [Ground Lease] in 2015 if they had been concerned about them;

and (3) CPC and CVS had accused each other of breaches of contract and CPC was contemplating initiating a lawsuit against CVS:

> We had no other option than to notify CVS of its breach of contract on August 17. On August 22, 2017, CVS replied that it was my client and not CVS that had breached the [Ground Lease] by not "purchasing and trying to deliver" the [Parcels]. . . . My client is exploring all options at this time, including hiring litigation attorneys to handle the matter from now on.

Accordingly, by August 25, 2017, the Sellers had knowledge that, as far as CVS was concerned, the deal was dead. And because the Agreements required "tenant [(i.e., CVS)] approval" -- a requirement of which the Sellers were aware -- CPC was not obligated to close on the Parcels.

This necessarily means that the Sellers had actual knowledge by August 25, 2017 of both their theories of CVS's alleged negligence. Take first the Sellers' theory of negligence regarding the transformer and signage and their alleged contribution to the vandalism of the Parcels. The Sellers knew that the transformer was removed in June 2017; that Sanchez, CVS's outside engineer, posted the signage by August 2017; and that the Parcels had all been vandalized by late August 2017. Therefore, when CVS backed out of the deal, and the Sellers were informed of this on August 25, 2017, they were necessarily informed that they would now have to shoulder the responsibility for any damage to the Parcels and that CVS was the blame-worthy culprit.

The Sellers argue that they did not have actual knowledge that CVS was responsible for the transformer's removal until May 26, 2018, when the Nieves-Acevedo Sellers, through their electrician, contacted the AEE to reinstall the power to the Parcels -- a fact with which the district court agreed. That's a fair point, and the record supports it. However, the Sellers at

least had deemed knowledge that CVS was at fault for the removal of the transformer. Remember, deemed knowledge requires reasonable due diligence on the Sellers' part and reasonable due diligence means "reasonable, active efforts to seek answers and clarify doubts." Est. of Alicano Ayala v. Philip Morris, Inc., 263 F. Supp. 2d 311, 317 (D.P.R. 2003). Here, the Sellers made no active efforts to clarify who removed the transformer (and recall it's their burden). Rather, the record shows that they made no effort to identify the culprit, as the Nieves-Acevedo Sellers simply asked their electrician to contact the AEE to reinstall the power, not to identify who removed the transformer to begin with. Moreover, this is a scenario where minimal efforts would have revealed the culprit. As the record shows, a call to the AEE would have sufficed. Such "[f]ailure to . . . conduct . . . investigative efforts constitutes lack of diligence." Id.

Take second the Sellers' theory of negligence regarding CVS's failure to terminate the Ground Lease upon learning of the restrictive covenants. The August 25, 2017 Letter explicitly gave the Sellers actual knowledge of this potential claim for negligence, as it stated that CVS "knew that these [restrictive covenants] had affected the [Parcels] since [they were] developed in 1964 and that all the title searches reviewed and approved by CVS reflected the same" and that "[t]hese restrictive conditions were never a matter of concern for CVS, which had plenty of time

- 43 -

to inform us since signing the [Ground Lease] in 2015 if they had been concerned about them."

Even assuming that the August 25, 2017 Letter did not give the Sellers actual knowledge of CVS's alleged negligence (though such an assumption is hard to square), the Letter gave them, at minimum, deemed knowledge. To explain, while the Sellers emphasize that the August 25, 2017 Letter stated at the very end that "[a]s soon as we have more news, we will inform you," which the Sellers contend created doubt in their minds as to whether the deal was dead-dead, the August 25, 2017 Letter at least gave the clear and distinct impression that CVS had decided not to move forward and, therefore, "create[d] a reasonable basis for concern about negligence." Id. (citation and internal quotation marks omitted). Saddled with these blaring doubts regarding CVS's decision, it was on the Sellers to make "reasonable, active efforts to seek answers and clarify doubts" from CVS, the alleged tortfeasor. Id. Yet, at no point did any of the Sellers make any attempt to contact CVS directly after receiving the August 25, 2017 Letter.[28] Therefore, the Sellers had actual or deemed knowledge of CVS's alleged negligence by August 25, 2017.

Resisting this conclusion, the Sellers offer two primary counterarguments -- neither of which prove persuasive. First up,

_____

[28] Nothing in the Agreements prevented the Sellers from contacting CVS directly.

they argue that the statute of limitations was tolled in this case because of Rivera's post-August-25 statements to the Sellers, allegedly assuring them that the Closing would still occur.  It is true that "[w]here the tortfeasor, by way of assurances and representations, persuades the plaintiff to refrain from filing suit, or otherwise conceals from the plaintiff the facts necessary for her to acquire knowledge, the statute of limitations will be tolled."  Alejandro-Ortiz, 756 F.3d at 27 (emphasis ours).  But the statements the Sellers point to weren't made by CVS; they were made by CPC.  And "only the assurances of the tortfeasor, and not those of a third party, . . . can lead to such tolling."[29]  Rivera-Carrasquillo, 812 F.3d at 216 n.3 (citation and internal quotation marks omitted).  Without any statements made by CVS, the Sellers cannot claim assurances tolled the one-year clock.[30]

---

[29] The Sellers point to our decision in Rodríguez-Surís for the proposition that third-party statements can toll the statute of limitations.  That's not correct.  There, we stated that "representations made by third-party doctors constitute another factor to consider in determining whether a plaintiff's continued reliance upon the reassurances of a tortfeasor is reasonable."  Rodríguez-Surís, 123 F.3d at 17.  As such, third-party assurances are only relevant where the tortfeasor also made assurances, which is not the case here.

[30] In a last-ditch effort on the assurances front, the Sellers point to three pieces of evidence allegedly ignored by the district court:  (1) "prior correspondence from CPC to CVS, which suggests that CPC's decision to refrain from purchasing the [S]ellers' [Parcels] was anything but final;" (2) the fact that "CVS's Escrow Agent was instructed to hold and refrain from releasing the $300,000.00 held in escrow, which likewise creates the expectation that the deal could possibly proceed at a future time;" and (3) the Municipality also seemed to think the Closing was still on,

And even if CPC's assurances were legally relevant (they're not), the Sellers' reliance on those assurances must have been reasonable and there's good reason to believe that any such reliance stopped being reasonable by the end of 2017. Rodríguez-Surís, 123 F.3d at 17 ("The reliance [on assurances], however, must be reasonable."). The Agreements, as we discussed above, required that the Closing occur within 30 days of the end of the Inspection Period. Over the many years of the Sellers' contractual relationship with CPC, the Inspection Period was extended several times either before its expiration or within a few days of its expiration, ostensibly in order for the parties to have more time to close on the Parcels in accordance with the Agreements' terms. The final extension of the Inspection Period extended it to October 30, 2017, but that date (plus thirty days) passed with no further extension. As such, the Agreements' own terms and the parties' usual course of dealing should have made it apparent to the Sellers that the Closing was off (or at least that there was a high probability that the Closing was off), despite CPC's months-old assurances to the contrary.

---

because it reached out to CPC seeking clarification on the status of the Closing. The problem is, though, the Sellers point to no evidence that they were aware of either the correspondence or the instructions to the Escrow Agent. And as for the Municipality's expectations, that argument fails because any expectation the Municipality might have had was generated by CPC, not by CVS.

Moving onto the Sellers' second counterargument. They contend next that their extrajudicial claim letters sent to CPC tolled the statute of limitations as to CVS. Puerto Rico law does allow for the tolling of the statute of limitations "by making an extrajudicial claim." Alejandro-Ortiz, 756 F.3d at 29. That extrajudicial claim, though, must be made to each joint tortfeasor, because "the statute of limitations must be tolled separately for each joint tortfeasor." Rivera-Carrasquillo, 812 F.3d at 217 n.4 (quoting Fraguada-Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365, 389 (P.R. 2012)). Here, the Sellers' extrajudicial claim letters were only sent to CPC,[31] not CVS. So, normally, the Sellers would be out of luck.

There is, however, an exception to this rule, upon which the Sellers attempt to rely. If there is "perfect solidarity" between the joint tortfeasors, "tolling as to one co-tortfeasor [such as through an extrajudicial claim] will toll [the statute of limitations] as to the rest." Calderón Amézquita v. Rivera-Cruz, 483 F. Supp. 3d 89, 106 (D.P.R. 2020) (citation omitted). Perfect solidarity sounds complicated, but it simply refers to circumstances where "several persons [are] joined by a common interest, [and] have frequent relations among themselves or know

---

[31] The fact that the Sellers all sent CPC an extrajudicial claim letter is why CPC, unlike CVS, did not have a statute-of-limitations defense.

each other." Id. (citation omitted). Courts have commonly found perfect solidarity in certain relationships where a party is vicariously liable for the acts of another, such as the employer-employee, hospital-physician, or insurer-insured relationship. See, e.g., Cruz Cedeño v. HIMA San Pablo Bayamón, No. 19-1477 (CVR), 2022 WL 17541923, at *4 (D.P.R. Dec. 7, 2022) ("The Puerto Rico Supreme Court held that there is perfect solidarity between joint tortfeasors who operate under an employer-employee relationship because that relationship is 'about a liability imposed on the principal based on the relationship he has with the tortfeasor of the damage.'" (quoting Pérez-Hernández v. Lares Med. Ctr., Inc., 207 D.P.R. 965, 984 (P.R. 2011))); Calderón Amézquita, 483 F. Supp. 3d at 106 (noting that "[s]everal judges in this District have held that a perfect solidarity obligation arises in medical malpractice cases where a hospital and physician are jointly liable for a physician's negligent care pursuant to [A]rticle 1803's vicarious liability doctrine" (citations and internal quotation marks omitted)); Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., No. 3:12-01862 (JAF), 2016 WL 1642627, *6 (D.P.R. Apr. 25, 2016) (noting that insurers are "solidarily liable for the acts of the insured" and "share perfect solidarity" with their insureds (citation and internal quotation omitted)). By contrast, "imperfect solidarity" refers to "relationship[s] [that are] merely accidental or sporadic, and the statute of limitations

must be tolled as to each individual co-tortfeasor." Calderón Amézquita, 483 F. Supp. 3d at 106.

As their final Hail Mary, the Sellers argue that perfect solidarity existed between CPC and CVS because they shared a common interest by virtue of the Ground Lease.  Accordingly, the Sellers' extrajudicial claim letters to CPC -- the argument goes -- tolled the one-year clock as to CVS.  We don't buy this argument for a few reasons.

To start, there is no vicarious liability between CPC and CVS and they never agreed to be jointly liable as to any damages to the Sellers.  This is important because, "pursuant to Puerto Rico law, the Court must generally assume that the relationship between the parties to an agreement is not of the joint and several type." Tonge v. Drs.' Ctr. Hosp., San Juan, Inc., 531 F. Supp. 3d 491, 500-01 (D.P.R. 2021) (citation omitted). What's more, even taking the Sellers' shared-interest theory head on, it leaves a bit to be desired.

Other than the Ground Lease, the only evidence the Sellers rely upon to demonstrate CPC's and CVS's "frequent relations" is one sentence in a letter from Rivera to CVS, referring to "a prior CVS deal between affiliates of [CPC] and [CVS]."  But this sentence doesn't even identify when this deal took place or what the nature of the deal was.  Moreover, this prior deal was not even between CPC and CVS, but rather between

their affiliates. Additionally, to the extent CPC's and CVS's lessor-lessee relationship can constitute perfect solidarity, CVS never actually ended up leasing the Parcels because it determined the Parcels did not satisfy the conditions precedent.

Significantly, the Sellers' only theory of perfect solidarity (as we understand it) is that CPC and CVS shared a common interest through the Ground Lease -- the argument being that they shared a common goal of wanting the real estate transaction to come to fruition. But this theory is belied by the Sellers' briefing and remaining arguments. Elsewhere in the Sellers' briefing, they urge us to remember that the district court, in adjudicating CPC's and CVS's cross-motions for summary judgment, made several factual findings that support their contention that CVS acted tortiously towards them. These facts relate to CVS's alleged behind-the-scenes efforts to extricate itself, as early as 2015, from contracts based in Puerto Rico, including the Ground Lease. Therefore, CPC and CVS did not even share a common interest by virtue of the Ground Lease, because, by the Sellers' own arguments, CVS had no plans to carry out the contract. And with that, the Sellers have not met their burden of demonstrating perfect solidarity between CPC and CVS.

In sum, having found that the Sellers had actual or deemed knowledge of their injuries and CVS's identity by August 25, 2017, and having parried all of their counterarguments as to

tolling, we conclude their lawsuit as to CVS was filed too late and summary judgment in CVS's favor was appropriate.[32]

## EPILOGUE

At long last, our story has reached its end, resulting in a summary-judgment loss for the Sellers. We recognize that this is not the fairy-tale ending for which the Sellers yearned; their Parcels have been damaged and they have little recourse to make them whole. Nevertheless, because we conclude that the district court reached the right outcome, we must affirm, with the parties to bear their own costs.[33]

## FIN

---

[32] Two more stray points that need to be addressed. First, as previewed above, the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers argue that many of the facts found by the district court in its decision on CPC's and CVS's cross-motions for summary judgment preclude us from ruling for CVS now. Because the district court found CVS was attempting to extricate itself from the Ground Lease, the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers contend CVS made misrepresentations to them as to its intent to move forward with the Ground Lease and acquisition of the Parcels. None of the facts found by the district court, however, change our statute-of-limitations analysis. Moreover, nowhere do the Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers try to explain (and recall, it is their burden) how the one-year clock does not bar this misrepresentation theory.

Second, the Cruz Marrero Sellers raise to us a tortious interference claim against CVS, which they did not raise to the district court. As always, that means this claim is waived. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden, 11 F.4th 12, 20 (1st Cir. 2021).

[33] One final note before we part. The Hamdallah/Nieves-Roman/Nieves-Acevedo Sellers raise a litany of material facts, which they think the district court ignored and which they think preclude summary judgment as to both CPC and CVS. We see no evidence of that, but, to the extent the district court overlooked any of these facts, our review as always is de novo and we have considered the record as a whole (including the aforementioned material facts).

- 51 -