# United States Court of Appeals
## For the First Circuit

No. 22-1700

THOMAS "T.J." CIARAMETARO,

Plaintiff, Appellant,

v.

CITY OF GLOUCESTER; CHARLES "CHIP" PAYSON, individually and as
Gloucester's City Solicitor; JAMES DESTINO, as Gloucester's
former Chief Administrative Officer; HOLLY DOUGWILLO,
individually and as Gloucester's Human Resources Director;
SEFATIA ROMEO THEKEN, individually and as Mayor of Gloucester,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Kayatta, Lipez, and Rikelman,
Circuit Judges.

Liam T. O'Connell, with whom Farrell Smith O'Connell was on
brief, for appellant.
John J. Davis, Jr., with whom Justin L. Amos and Pierce
Davis & Perritano LLP were on brief, for appellees City of
Gloucester, Charles "Chip" Payson, James Destino, and Holly
Dougwillo.
Leonard H. Kesten, with whom Deidre Brennan Regan, Francesca
M. Papia, and Brody, Hardoon, Perkins & Kesten, LLP were on brief,
for appellee Sefatia Romeo Theken.

November 28, 2023

**KAYATTA**, **Circuit Judge**.  Thomas Ciarametaro, the Harbormaster of the City of Gloucester, Massachusetts, claims that several Gloucester city officials (the "City Officials") violated his First Amendment rights because they retaliated against him for his expert testimony in a maritime tort dispute between several Gloucester fishermen and the United States Coast Guard.  The district court granted summary judgment to the City Officials.  In so ruling, the district court concluded that qualified immunity shielded the City Officials -- in their personal capacities -- from Ciarametaro's First Amendment retaliation claims.  Ciarametaro appeals only that conclusion.  Because we agree that the City Officials are entitled to qualified immunity, we affirm.

## I.

## A.

In reviewing the grant of a motion for summary judgment dismissing Ciarametaro's claims, we accept the facts in the light most favorable to him, and we draw all reasonable inferences on his behalf.  See Potvin v. Speedway LLC, 891 F.3d 410, 413–14 (1st Cir. 2018).

As Harbormaster, Ciarametaro regulates and maintains the Gloucester waterfront.  His duties include enforcing local maritime ordinances, responding to boating emergencies, maintaining harbor facilities, and cooperating with state and federal maritime agencies.  Ciarametaro also owns a private

consulting firm called Five Fathoms Consulting, which provides, among other things, "marine investigation and expert witness" services.[1]

In January 2018, counsel for two Gloucester fishermen (and the estate of a third fisherman) approached Ciarametaro in his capacity as the owner of Five Fathoms Consulting. The fishermen were suing a Gloucester fishing captain and the United States Coast Guard, alleging that both parties negligently sank the fishermen's stranded vessel during a botched rescue attempt. See Complaint at 3-7, Lane v. Powell, No. 17-12356-PBS (D. Mass. Nov. 30, 2017). The fishermen asked Ciarametaro to testify on their behalf as an expert witness in the case (the "Lane case").

Before accepting the offer, Ciarametaro contacted Charles Payson, the then-City Solicitor of Gloucester. According to Ciarametaro, Payson stated that he had "no problem" with the expert witness arrangement, given that neither Ciarametaro nor the Harbormaster's Office had been involved in the Lane accident. Payson then recommended that Ciarametaro speak to the Massachusetts State Ethics Commission. Ciarametaro alleges that he did so. He also alleges that the Commission's representative advised him that testifying in the Lane case would present "no

---

[1] The parties agree that Gloucester officials may pursue outside employment that does not interfere with their public duties.

- 4 -

legal or ethical conflict." Shortly thereafter, Ciarametaro accepted the expert witness assignment.

Ciarametaro filed his expert report in June 2019. The report criticized the actions of both the rescuing fishing captain and the Coast Guard. Ciarametaro wrote that "everything about [the defendant-fishing captain's tow of the plaintiffs' vessel] was improper from the start." He also described the Coast Guard response as plagued by a "significant breakdown in communication . . . up and down the chain of command." Trial on the Lane case was scheduled for July 2020.

On April 6, 2020, James Destino -- the then-Chief Administrative Officer of Gloucester -- learned from the president of the Massachusetts Lobstermen's Association ("MLA") that Ciarametaro was an expert witness in the Lane case. Destino then called Ciarametaro, expressing concern that the latter's testimony in Lane would strain Gloucester's relationships with the fishing community, harm Ciarametaro's reputation, and cost Ciarametaro his job. During the call, Destino and Ciarametaro discussed the risk that the public would look askance at Gloucester's harbormaster testifying against a Gloucester fishing captain. In a follow-up text exchange later that day, Destino wrote that he did not want to see Ciarametaro's "good reputation in town . . . [compromised]." The pair discussed how Ciarametaro could

- 5 -

"extricate" himself from the Lane case, and Ciarametaro agreed to try to withdraw as an expert witness.

After the April 6 call with Destino, Ciarametaro texted Sefatia Theken, the then-Mayor of Gloucester. Ciarametaro wrote that he "[understood] the public perception" of his testimony in the Lane case. He also emphasized that he was "working . . . to recuse [himself]" from the case.[2] Theken wrote back that the Lane case was a "big conflict" that could undermine the fishing community's trust in the Harbormaster's Office. Theken also left Ciarametaro a voice message, in which she berated him in crude terms, threatened his job, demanded that he recuse himself from Lane, and warned that he was "losing the trust of the fishermen." In an email exchange with Ciarametaro and several other City Officials on April 7, Theken reiterated that she did not want to "los[e] the trust" of local fishermen or risk a "conflict" between Ciarametaro's public and private duties. In the same email exchange, Payson added that Ciarametaro's involvement in Lane "sends a clear message to the fishing community that if you stop and help a fellow fisherman you could be liable for negligence."

_____

[2] In a separate email to Theken -- also dated April 6 -- Ciarametaro suggested that recusal "may not be . . . simple at this point," and asked Theken to advise him on how to proceed. He did not retract his previous statements that he would attempt to withdraw from the case.

On April 9, Theken received a letter from the executive director of the MLA. The letter stated that the MLA's members had a "lack of faith within the port of Gloucester," with "many commercial fishermen [questioning] the reliability and position individual harbormasters have taken on [the Lane case]." The letter went on to say that "commercial fishermen need a champion now more than ever[,] and not an anti-fisherman authority working against them[.]"

Despite the City Officials' newly reinforced concerns, and his prior indications that he would try to withdraw as a witness, Ciarametaro remained an expert witness in the Lane case. Starting in April 2020, the City Officials allegedly began a campaign of retaliation against Ciarametaro. He claims that the City Officials created a hostile work environment by excluding him from important policymaking meetings and subjecting him to repeated verbal abuse. For example, Ciarametaro claims that Theken called him a "fraud" and an "asshole" and suggested to others that her relatives should "brea[k] [Ciarametaro's] kneecaps." He also alleges that the City Officials reduced his compensation by denying him permission to work on overtime details, and by withholding a previously agreed-upon pay raise that Ciarametaro expected to receive after the Harbormaster's Office merged with the Gloucester Shellfish Department. Ciarametaro further alleges that the City Officials interfered with his management of the Harbormaster's

- 7 -

Office, particularly by harassing one of Ciarametaro's part-time administrative clerks and accusing her of "f*****g everyone in the [Harbormaster's Office]."

Finally, Ciarametaro alleges that the City Officials conspired to conjure a pretext for firing him. For example, he alleges that Theken admitted to working with Holly Dougwillo -- Gloucester's Human Resources Director -- to "fis[h] for wrongdoing" in his personnel files. And he alleges that Destino told the other City Officials that "the goal is to get rid of [Ciarametaro] . . . Human Resources has been building a file against him, he's done."

**B.**

In February 2021, Ciarametaro sued the City of Gloucester and the City Officials (i.e., Theken, Destino, Payson, and Dougwillo) in Massachusetts state court. The complaint, as later amended, includes three counts. Count I is a tort claim for intentional infliction of emotional distress. Count II is a First Amendment retaliation claim under 42 U.S.C. § 1983. Count III is a civil rights claim under the Massachusetts Civil Rights Act. The City and the City Officials timely removed the case to the U.S. District Court for the District of Massachusetts.

The district court granted summary judgment to the defendants on all counts. As relevant here, the district court held that Counts II and III failed as against the City Officials

in their personal capacities because it was not "clearly established" that Ciarametaro's speech "enjoyed First Amendment protection." The district court held that the City Officials were therefore entitled to qualified immunity.

Ciarametaro timely appealed, challenging only the district court's qualified immunity finding as to the City Officials. Ciarametaro argues that by retaliating against him for his expert testimony in Lane, the defendants violated his clearly established First Amendment rights. He does not argue that the City Officials are liable for damages even if their alleged retaliation were constitutionally permissible. Nor does he argue that even if some form of retaliation were legally permissible, the specific nature of the City Officials' retaliation nevertheless violated his First Amendment rights.

## II.

### A.

Qualified immunity shields public officials from personal liability for "actions taken while performing discretionary functions." Lynch v. City of Boston, 180 F.3d 1, 13 (1st Cir. 1999). The goal of qualified immunity is to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). To achieve that goal, a court will grant qualified immunity unless it is "sufficiently clear

'that every reasonable official would [have understood] that what he [was] doing violate[d]'" the plaintiff's rights. <u>Reichle</u> v. <u>Howards</u>, 566 U.S. 658, 664 (2012) (first alteration in the original) (quoting <u>Ashcroft</u>, 563 U.S. at 741). Qualified immunity therefore protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley</u> v. <u>Briggs</u>, 475 U.S. 335, 341 (1986).

To surmount qualified immunity, a plaintiff must show that 1) the official "violated a statutory or constitutional right," and 2) the ostensibly violated right was "clearly established" at the time of the challenged conduct. <u>Ashcroft</u>, 563 U.S. at 735. The plaintiff must point to controlling authority, or a "robust consensus" of persuasive authority, clearly demonstrating the "violative nature of [the defendant's] particular conduct." <u>Id.</u> at 741-42 (internal citations and quotations omitted). That authority need not be "directly on point," but a plaintiff also may not "define clearly established law at a high level of generality." <u>Id.</u> at 741-42. Instead, the plaintiff must identify authority that is sufficiently analogous to "place[] the statutory or constitutional question beyond debate." <u>Id.</u> at 741.

**B.**

To determine whether a public employer violates an employee's First Amendment rights by retaliating against him on

account of his speech, we employ a three-step standard.  See Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008).

The first step is to determine whether the public employee "spoke as a citizen on a matter of public concern."  Id.  The second step requires balancing the value of the employee's speech -- both to himself and to the public -- against the government employer's legitimate interest in "preventing unnecessary disruptions and inefficiencies in carrying out its public service mission."  Guilloty Perez v. Pierluisi, 339 F.3d 43, 52 (1st Cir. 2003) (quoting O'Connor v. Steeves, 994 F.2d 905, 915 (1st Cir. 1993)); see also Garcetti v. Ceballos, 547 U.S. 410, 420 (2006) (noting the need to respect both the "individual and societal interests" in the public employee's speech and the ability of the public employer to "perform [its] important public functions.").  This balancing inquiry is known as Pickering balancing.  See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., 391 U.S. 563, 568 (1968) (articulating the original version of the balancing test).

If an employee's speech satisfies the first two steps, then it is protected speech under the First Amendment.  See Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 66-67 (1st Cir. 2015).  The analysis then proceeds to the third step, which asks whether the protected speech was a "substantial or motivating

factor in the adverse employment decision." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007).

As to step one, for purposes of summary judgment, the City Officials do not meaningfully dispute that Ciarametaro spoke as a private citizen on a matter of public concern. So, we can proceed to step two (the Pickering analysis), within the context of a qualified immunity defense. We ask whether, at the time of the City Officials' alleged retaliation, the law clearly established that the value of Ciarametaro's speech outweighed the municipality's interest in the efficient provision of public services by the Harbormaster's Office. For the following reasons, we find that it did not.[3] The City Officials are therefore entitled to qualified immunity, and we need not address step three of the First Amendment retaliation analysis.

## III.

### A.

We start by analyzing the City Officials' Pickering interest in the efficient provision of public services. At the outset, Ciarametaro asserts that there is "no evidence that [his

---

[3] Our analysis of Ciarametaro's federal claim under section 1983 applies equally to his state claim under the Massachusetts Civil Rights Act. The Massachusetts Supreme Judicial Court has made clear that the "[f]ederal system of immunity for discretionary functions under [section] 1983" also applies to claims brought under the Massachusetts Civil Rights Act. Duarte v. Healy, 537 N.E.2d 1230, 1232 (Mass. 1989).

testimony] was disruptive to the [Harbormaster's Office] or the [City]."  But an employer need not "allow events to unfold to the extent that the . . . destruction of working relationships is manifest before taking action."  Curran, 509 F.3d at 49 (quoting Connick v. Myers, 461 U.S. 138, 152 (1983)).  Instead, to assess the employer interests implicated by Ciarametaro's speech, the relevant question is whether the City Officials were reasonably concerned that Ciarametaro's expert testimony would disrupt relationships between commercial fishermen and the Harbormaster's Office.  Id. (quoting Waters v. Churchill, 511 U.S. 661, 673 (1994)) ("[R]easonable [employer] predictions of disruption" receive significant weight under Pickering); see also Kinney v. Weaver, 367 F.3d 337, 364 (5th Cir. 2004) (en banc) ("The key limitation on preemptive action . . .is that [an employer's] predictions of disruption must be reasonable.").

 Ciarametaro's brief concedes that the City Officials were, in fact, "concerned" that his speech was causing local fishermen to "question the continued successes of the fleet in Gloucester."  City Officials expressed such concerns immediately upon learning about Ciarametaro's involvement in the Lane case in April 2020.  In his phone call with Ciarametaro, Destino emphasized the public perception risks of the City Harbormaster testifying against a local fisherman.  Theken wrote in a text message to Ciarametaro that the testimony created a "big conflict" that could

drive the fishing community to "lose trust" in the Harbormaster's Office. And Payson stated in an email that Ciarametaro's Lane testimony sent a "clear message" to the fishing community that the Harbormaster may not support them in a similar tort suit.

The City Officials' concerns about the disruptive impact of Ciarametaro's testimony were certainly reasonable. Indeed, the organization representing many local fishermen -- the MLA -- expressly told Theken that those fishermen considered the Harbormaster's Office to be "anti-fisherman." Given that blunt language, the City Officials could reasonably predict that Ciarametaro's testimony risked undermining his ability to "[p]romote the City as a hospitable port of call." Ciarametaro himself was aware of this risk. In his text messages with Theken, Ciarametaro acknowledged that his testimony threatened the "public perception" of his department.[4]

This is therefore not a case like Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004), in which the plaintiff alleged that the content of his speech -- rather than concerns about the impact of that speech on his job performance -- provoked his employer's retaliatory pique. Id. at 103-08. Here, Ciarametaro acknowledges that the City Officials were concerned about his testimony

---

[4] At oral argument, Ciarametaro's counsel conceded that these text messages reflected Ciarametaro's belief that his testimony could disrupt the relationship between the Harbormaster's Office and the fishing community.

- 14 -

alienating an important local industry.  In sum, the defendants'
side of the Pickering scale bears substantial weight.

**B.**

Were we required to decide finally whether the City
Officials violated Ciarametaro's First Amendment rights, we would
now need to balance the City's foregoing interests against the
interests of Ciarametaro and the public in his Lane testimony.
Garcetti, 547 U.S. at 420.  This would be a delicate and "fact-
intensive" inquiry.  Fabiano v. Hopkins, 352 F.3d 447, 457 (1st
Cir. 2003).

But we need not undertake this inquiry.  This is because
the outcome of such a difficult and fact-bound analysis "can rarely
be considered 'clearly established,' at least in the absence of
closely corresponding factual or legal precedent."  Frazier v.
Bailey, 957 F.2d 920, 931 (1st Cir. 1992).  And Ciarametaro
identifies no "closely corresponding" precedent clearly
establishing that the City Officials -- at the time of their
actions -- could not restrict his expert testimony to preserve
relationships with the Gloucester fishing community.

In his brief, Ciarametaro indirectly cites to Rankin v.
McPherson, 483 U.S. 378 (1987), where the Supreme Court noted that
it is "clearly established that a State may not discharge an
employee on a basis that infringes that employee's
constitutionally protected interest in freedom of speech."  Id. at

- 15 -

383.  This simply begs the question.  Ciarametaro's citation to Rankin tautologically presumes that his speech was protected.  But whether and how clearly Ciarametaro's speech was protected in the first place is the crux of this entire dispute.

In a supplemental letter to the court, Ciarametaro points to Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002).  But Swartzwelder is plainly distinguishable on its facts.  That case involved a sweeping police department policy that required "the vast rank and file" of officers to obtain approval before giving expert opinion testimony.  297 F.3d at 231-32, 237 (quoting United States v. Nat'l Treasury Emp. Union, 513 U.S. 454, 472 (1995)).  The breadth of that prior restraint invited a "tailoring requirement," id. at 236, which the police department's broad policy could not satisfy, id. at 241.  By contrast, this case involves a town responding to specific testimony by a specific official.  Hence, it does not present the overbreadth defect that took center stage in Swartzwelder.

In the same letter, Ciarametaro also cites to Brady v. Tamburini, 518 F. Supp. 3d 570 (D.R.I. 2021).  Brady is a district court case, and district court decisions "do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity."  Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011).  In any event, Brady is inapposite.  There, a police department disciplined a detective for comments he made to a newspaper

- 16 -

reporter. 518 F. Supp. 3d at 577. The district court concluded that Pickering balancing favored the officer, because the department "presented no evidence" that the officer's speech actually or potentially disrupted department operations. Id. at 586. That is not the case here, where the City Officials had ample reason to believe that Ciarametaro's speech threatened relationships with commercial fishermen.

Our own review also reveals no case clearly establishing that Ciarametaro's speech was categorically entitled to First Amendment protection. See Elder v. Holloway, 510 U.S. 510, 512 (1994) ("[A]ppellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents . . . ."). In fact, several appellate cases have held that a public employee's judicial testimony was not protected under Pickering when the testimony criticized third parties with whom the public employer wished to maintain a strong working relationship. See, e.g., Worrell v. Henry, 219 F.3d 1197, 1208 (10th Cir. 2000) (district attorney could withdraw an offer of employment to serve as the coordinator of a drug task force, because the offeree's past testimony on behalf of a criminal defendant risked relationships with a cooperating agency); Tedder v. Norman, 167 F.3d 1213, 1215 (8th Cir. 1999) (director of a law enforcement training center could demote his deputy, because the deputy's prior testimony in an excessive force case threatened relationships between the

training center and the law enforcement agencies it trained); cf. Gilchrist v. Citty, 173 Fed. App'x 675, 685 (10th Cir. 2006) (forensic lab could demote an analyst who previously gave faulty testimony because, among other things, further testimony could threaten the lab's credibility in court).

To be clear, we need not (and therefore do not) decide whether the value of Ciarametaro's speech outweighed the City Officials' interests under Pickering balancing. We hold only that the City Officials could have reasonably concluded that it did not. And even if the City Officials' reasoning was "mistaken, it would not have been egregiously so . . . . [A]ccordingly, qualified immunity is available." See Wagner v. City of Holyoke, 404 F.3d 504, 509 (1st Cir. 2005).

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.