# United States Court of Appeals
## For the First Circuit

No. 23-1817

KARI MACRAE,

Plaintiff, Appellant,

v.

MATTHEW MATTOS; MATTHEW A. FERRON; HANOVER PUBLIC SCHOOLS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Gelpí, Selya, and Thompson,
Circuit Judges.

Michael Bekesha, with whom Judicial Watch, Inc. was on brief, for appellant.
Gregor A. Pagnini, with whom Leonard H. Kesten, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten LLP were on brief, for appellees.

June 28, 2024

**THOMPSON, <u>Circuit Judge</u>**. Today's appeal was brought by Kari MacRae ("MacRae"), a former teacher at Hanover High School ("Hanover High") in Hanover, Massachusetts, against Hanover High's principal Matthew Mattos ("Mattos"), Hanover High's superintendent Matthew A. Ferron ("Ferron"), and Hanover Public Schools ("the District" and, collectively with Mattos and Ferron, "Defendants"). And here's the CliffsNotes' version of how the parties made it to our bench: MacRae posted six allegedly controversial memes to her personal TikTok account.[1] A few months after posting the first few of the six memes, she interviewed for a teaching position at Hanover High and got the job. Soon after starting there, MacRae's TikTok posts came to light and things hit the proverbial fan. Concluding that to "continu[e] [her] employment in light of [her] social media posts would have a significant negative impact on student learning" at Hanover High, Defendants terminated MacRae's employment.

Positive that Defendants had unconstitutionally retaliated against her for exercising her First Amendment rights,

---

[1] For those readers who don't keep up with the social-media trends of the day, "meme" is defined as either "an idea, behavior, style, or usage that spreads from person to person within a culture" or "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media," <u>Simpson</u> v. <u>Tri-Valley Cmty. Unit Sch. Dist. No. 3</u>, 470 F. Supp. 3d 863, 866 n.3 (C.D. Ill. 2020), and "TikTok is a video-sharing social-media platform," <u>Couture</u> v. <u>Noshirvan</u>, No. 23-cv-340, 2023 WL 8280955, at *1 (M.D. Fla. Nov. 30, 2023).

MacRae took them to court.  But Defendants didn't agree with her take on things, and neither did the district court, which granted their motion for summary judgment.  Now on appeal, MacRae implores us to do some course correction and fix what she says the district court got wrong.  After taking the time to carefully review both sides' arguments, however, we conclude that the district court got it right.  In other words, we affirm, but before explaining our reasons for doing so, a bit of factual and procedural table-setting is in order.

**TABLE-SETTING**

To begin, we set the table with a factual and procedural summary of how the parties got here.  And as this is an appeal of the grant a motion for summary judgment, we lay out the facts in the light kindest to the nonmovant (here, MacRae), drawing all reasonable inferences in her favor but only to the extent such inferences are supported by the record.  Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 8 n.1 (1st Cir. 2024).  The following facts are uncontested, unless indicated otherwise.

*The TikTok Posts*

MacRae is a Bourne, Massachusetts resident, who started working as a teacher in 2015 and has held several teaching positions since then.  In or around 2019, she created her own

personal TikTok account under the username of "NanaMacof4."[2]  At different points in 2021, but all prior to her employment at Hanover High, MacRae liked, shared, posted, or reposted the following six memes using her NanaMacof4 TikTok account:

- A photo of Dr. Rachel Levine, the United States Assistant Secretary for Health and a transgender woman, with text that reads: "'I'm an expert on mental health and food disorders.' . . . says the obese man who thinks he's a woman."
- A text display that reads: "I feel bad for parents nowadays.  You have to be able to explain the birds & the bees . . . The bees & the bees . . . The birds & the birds . . . The birds that used to be bees . . . The bees that used to be birds . . . The birds that look like bees . . . Plus bees that look like birds but still got a stinger!!! . . ."
- A photo of a muscular, bearded man wearing a sports bra with text at the top that reads: "Hi my name is Meagan, I'm here for the Girl's track meet."  The photo then includes additional text at the bottom that reads:  "Equality doesn't always mean equity."[3]
- A photo of a young and (presumably) white American man with text that reads: "Retirement Plan:  1) Move to Mexico 2) Give

---

[2] The account itself did not identify MacRae by name or indicate where she worked.

[3] At MacRae's deposition, she confirmed that she liked, shared, posted, or reposted all six memes using her NanaMacof4 TikTok account.  In a subsequent, sworn declaration, though, she backtracked her deposition testimony as it related to this track meet meme.  She clarified that she did not post it herself, but rather another TikTok user posted it and tagged her NanaMacof4 account.  Regardless of whether MacRae herself posted the track meet meme, it would still appear if someone searched "NanaMacof4" on TikTok, she confirmed that she stood by the views expressed on her TikTok page and in her posts "[o]ne hundred percent," and nothing in the record suggests she ever removed the tag.

up citizenship 3) Come back illegally 4) Set for life!"

- A photo of a panda bear with text that reads: "Dude, racism is stupid. I am black, white, and Asian. But everyone loves me."

- A photo of Thomas Sowell with a quote that reads: "Racism is not dead, but it is on life support -- kept alive by politicians, race hustlers and people who get a sense of superiority by denouncing others as 'racists.'" The photo then includes additional text at the top that reads: "Thank you Mr Sowell!!"

Also in 2021, MacRae ran unchallenged for a seat in her hometown on the Bourne School Committee, which was scheduled to hold an election on May 17, 2021. On election day, MacRae posted a campaign video on her NanaMacof4 TikTok account. In the video, she can be seen discussing her election platform and beliefs as a school board candidate:

> So pretty much the reason why I ran for school board and the reason why I'm taking on this responsibility is to ensure that students, at least in our town, are not being taught critical race theory. That they're not being taught that the country was built on racism. . . . So . . . they're not being taught that they can choose whether or not they want to be a girl or a boy. . . . It's one thing to include and it's one thing to be inclusive. And it's one thing to educate everybody about everything. It's completely another thing to push your agenda. . . . With me on the school board, that won't happen in our town.[4]

---

[4] For those curious readers, the video can be seen here: *Massachusetts teacher fired over TikTok school board campaign video on CRT*, Fox News (Dec. 2, 2021), https://www.foxnews.com/video/6284889512001 [https://perma.cc/MZ2X-TMGQ].

- 5 -

MacRae won the election.

A few months after her election win, in late August 2021, MacRae interviewed with the District's Curriculum Director Matthew Plummer ("Plummer") for a teaching position at Hanover High, a public school in Massachusetts about forty-five minutes away from Bourne. At the time of the interview, Plummer did not know about MacRae's TikTok posts or that she was an elected member of the Bourne School Committee. By letter dated August 25, 2021, the District informed her that she got the job and was set to start teaching math and business courses on September 1, 2021. Among the students MacRae was hired to teach were both African American and LGBTQ+[5] students.

*The Fallout*

On the very same day that MacRae was hired for the position at Hanover High, August 25, 2021, the Bourne School Committee received a letter from a "concerned citizen" complaining about MacRae's TikTok posts. That letter had a domino effect, which ultimately resulted in the termination of MacRae's employment at Hanover High.

---

[5] This acronym stands for "'lesbian, gay, bisexual, transgender and queer' with a '+' sign to recognize the limitless sexual orientations and gender identities used by members of the LGBTQ+ community." Macdonald v. Brewer Sch. Dep't, 651 F. Supp. 3d 243, 252 n.2 (D. Me. 2023) (citation omitted) (cleaned up).

During the evening of September 1, 2021 (the same day MacRae started teaching at Hanover High), the Bourne School Committee held an executive session, at which it determined that some of MacRae's TikTok posts violated the core values of Bourne Public Schools. The Bourne School Committee also stated it would have a public resolution at its next meeting to further address the issue and hear a "more formal statement" from MacRae. MacRae did not inform any Defendant about her posts or any of the goings-on related to the Bourne School Committee's September 1, 2021 executive session.

In the following days, the situation worsened. On September 15, 2021, the Bourne School Committee and Committee Chairperson were informed "that the social media posts directed at the LGBTQ population had circulated and staff and students were very upset." The Bourne Educators Association also met and voted unanimously "to make a public statement against the comments made by" MacRae.

All of this commotion ended up attracting the attention of the Cape Cod Times, a local newspaper which published an article about MacRae on Friday, September 17, 2021. The article discussed MacRae's social media activity and the reactions thereto from the Bourne School Committee and members of the Bourne community. It also indicated that the Bourne School Committee had scheduled its

next meeting for Wednesday, September 22, 2021, during which MacRae and members of the public could make a statement.[6]

By the morning of Monday, September 20, 2021, Plummer caught wind of the Cape Cod Times article because Stacey Pereira ("Pereira"), a business teacher at Hanover High, had seen the article over the weekend on her Facebook feed,[7] was concerned about its impact on the students, and brought it to Plummer's attention. Plummer thereafter sent a link to the article to Mattos and Ferron, who (to refresh the memory) are Hanover High's principal and superintendent, respectively. Their response was swift: Later that same morning, Mattos met with MacRae to inform her that Defendants had learned of her social media posts and had chosen to

---

[6] Any reader interested in reading the Cape Cod Times article can do so here: Cynthia McCormick, *Should a Bourne School Committee member resign because of her TikTok videos? Some say yes*, Cape Cod Times (Sept. 17, 2021), https://www.capecodtimes.com/story/news/2021/09/17/kari-macrae-bourn-school-committee-member-tiktok-controversial-lgbtq-critical-race-theory-statements/8367424002/ [https://perma.cc/5V7W-CTA5]. It's also worth noting that the media coverage was not limited to just this one Cape Cod Times article. For example, one publication that also picked up the story prior to MacRae's eventual termination was Boston.com, whose article can be found here: Julia Taliesin, *Bourne teachers want school committee member to resign after TikTok posts about race, gender*, Boston.com (Sept. 22, 2021), https://www.boston.com/news/local-news/2021/09/22/bourne-teachers-school-committee-resign-tiktok-race-gender/ [https://perma.cc/3K54-KAN5]. MacRae's story also got some airtime on local television.

[7] Again, for readers behind on today's social-media trends, Facebook "is a social networking [site] that allows users to communicate by creating Facebook 'pages.'" Ahmed v. Hosting.com, 28 F. Supp. 3d 82, 85 (D. Mass. 2014) (citations omitted) (cleaned up).

place her on paid administrative leave pending an investigation. Within the first day or so of MacRae's leave, Andrew McLean ("McLean"), a science teacher at Hanover High and Vice President of the Hanover Teacher's Union, overheard some students talking about MacRae's social media posts, but, when asked during a deposition taken a year later, could not recall the exact details of the students' conversation.

Wednesday, September 22, 2021 finally arrived and brought with it the Bourne School Committee's meeting. At the meeting, several people presented their concerns regarding MacRae's social media posts, including that "the posts did not create a safe, inclusive or welcoming learning environment within the school community." Among the speakers against the posts was a transgender student who highlighted that MacRae's posts were harmful to himself and any other transgender student. Other speakers put forth statistical data regarding the elevated risk of suicide in LGBTQ+ and African American youth. There were also some speakers who voiced support for MacRae. MacRae's supporters expressed their opinions that critical race theory should not be taught in Bourne Public Schools and that the Bourne School Committee was engaging in a "witch hunt" against MacRae. During the meeting, MacRae apologized not for her social media posts, but rather for the media attention her social media posts brought to Bourne Public Schools and the Bourne School Committee. As part of

Defendants' investigation into MacRae's social media posts, Ferron tuned in online for part of the Bourne School Committee meeting and discussed it with Plummer and Mattos the next day, September 23, 2021.[8]

Also as part of Defendants' investigation, Mattos interviewed MacRae on September 24, 2021. Ann Galotti ("Galotti"), Hanover High's Math Department Head, and McLean were also in attendance for this interview. During the interview, MacRae received a copy of her TikTok posts and a document containing the District's Mission Statement, Beliefs, and Core Values. The listed Beliefs included "[e]nsur[ing] a safe learning environment based on respectful relationships." Among the Core Values listed were "[c]ollaborative relationships" and "[r]espect for human differences." The interview involved Mattos asking MacRae a series of questions, including if she could "see how the media coverage may be widespread among students and staff, [and] families of Hanover High School." She "agreed that there w[ere] probably some students and staff that were aware of it."

---

[8] Also on September 23, 2021, the Cape Cod Times published another article on MacRae, this time recapping the happenings at the Bourne School Committee's September 22, 2021 meeting. Paul Gately, *Bourne school board member won't resign over social media posts*, Cape Cod Times (September 23, 2021), https://www.capecodtimes.com/story/news/2021/09/23/kari-macrae-wont-resign-bourne-school-committee-over-tik-tok-lgbtq-critical-race-theory/5824685001/ [https://perma.cc/M9UN-JTW3].

As Mattos and Ferron were concerned about the potential negative impact MacRae's social media posts would have on staff and students, they decided, with input from Plummer, to terminate her employment. On September 29, 2021, Defendants sent MacRae a termination letter, explaining that "continuing [her] employment in light of [her] social media posts would have a significant negative impact on student learning" at Hanover High.

At some point during all this, TikTok deleted MacRae's NanaMacof4 account for "community standard violations" relating to the posts at issue today.[9]

*The Lawsuit*

MacRae did not take her termination on the chin. Rather, she filed the instant lawsuit on November 29, 2021, and later amended her complaint to assert a single claim against Defendants under 42 U.S.C. § 1983[10] for allegedly retaliating against her for exercising her First Amendment rights. Defendants eventually filed a motion for summary judgment. In their motion, they argued

---

[9] Also worth mentioning is that a later effort to recall MacRae from the Bourne School Committee proved unsuccessful due to deficiencies in the recall paperwork. Paul Gately, *Unaffirmed signatures de-rail efforts to recall school committee's Kari MacRae*, Cape Cod Times (Feb. 15, 2022), https://www.capecodtimes.com/story/news/2022/02/15/cape-cod-kari-macrae-recall-effort-de-railed-bourne-petition-signature-issue/6803511001/ [https://perma.cc/64C7-JA8Q].

[10] At the risk of oversimplification, this statute allows a party to seek "money damages against state actors who violate the [federal] Constitution." Quinones-Pimentel v. Cannon, 85 F.4th 63, 68 (1st Cir. 2023).

that (1) when applying the First Amendment retaliation framework for claims brought by public employees against their government employers, Defendants' interest in preventing disruption to the learning environment at Hanover High outweighed MacRae's First Amendment interest; and (2) Mattos and Ferron were entitled to qualified immunity.[11]

MacRae, on the other hand, had a much different view of the issues. In her opposition, she argued that (1) the First Amendment retaliation framework for claims brought by public employees against their government employers should not apply here because she posted the memes to her TikTok account before she started the job at Hanover High and, thus, her posts constituted pre-employment speech; (2) even if that framework did apply, there were seven genuine disputes of material fact that precluded the district court from giving Defendants a summary-judgment win under that framework,[12] and, regardless, her First Amendment interest

_____

[11] For those new to all this legal mumbo jumbo, qualified immunity is a judge-created doctrine, which lets public officials off the hook for money damages when they decide open legal questions in reasonable (but ultimately wrong) ways. Ciarametaro v. City of Gloucester, 87 F.4th 83, 87-88 (1st Cir. 2023).

[12] The seven alleged genuine disputes of material fact were (1) whether the TikTok campaign video factored into Defendants' decision to fire MacRae; (2) whether MacRae posted the track meet meme; (3) whether Defendants fired MacRae because they allegedly disliked her TikTok posts (as opposed to for their stated concern regarding disruption to the learning environment); (4) whether Defendants misinterpreted MacRae's intent in posting the memes and video; (5) whether Defendants were aware of any teacher's concerns about MacRae's TikTok posts; (6) whether MacRae acknowledged that

- 12 -

outweighed Defendants' interest; and (3) those same genuine disputes of material fact precluded the district court from granting Mattos and Ferron qualified immunity.

For its part, the district court agreed with Defendants' takes on things, concluding that (1) the framework for claims brought by public employees applied; (2) the factual disputes MacRae raised did not amount to genuine disputes of material fact; (3) Defendants' interest in preventing disruption outweighed MacRae's free speech interests; and (4) Mattos and Ferron were entitled to qualified immunity.

Not to be outdone, MacRae filed a timely appeal and brought the case to our attention.

### THE MAIN COURSE

With the table set, we turn our attention to the main course: the merits of MacRae's appeal. Remember that MacRae raised only one claim under 42 U.S.C. § 1983 against Defendants for terminating her employment and thereby (allegedly) retaliating against her for exercising her First Amendment rights. To state a § 1983 claim, she must make a two-part showing that Defendants acted under color of state law and that they denied her a right secured by the federal Constitution or federal law. Najas Realty,

_____

her TikTok posts may impact the learning environment at Hanover High; and (7) whether MacRae's TikTok posts caused or would cause a disruption to learning.

- 13 -

LLC v. Seekonk Water Dist., 821 F.3d 134, 140 (1st Cir. 2016).

Because no one disputes that Defendants were acting under color of state law when they let MacRae go, the only real question before us is whether they violated her First Amendment rights in doing so.

As to that question, MacRae essentially makes only two arguments on appeal:  The First Amendment retaliation framework for claims brought by public employees does not apply here and, even if it did, Defendants' interest does not outweigh her First Amendment interest.[13]  Defendants naturally disagree with both arguments and, as it turns out, so do we.  Before explaining why we disagree, though, we press pause to describe our standard of review.

*Standard of Review*

Summary-judgment decisions get de novo review on appeal, which, to speak plainly, just means that we give the arguments and the issues a fresh look without any deference to the district

---

[13] Eagle-eyed readers following along closely will note that conspicuously absent from this list is any challenge on MacRae's part to the district court's determinations that there were no genuine disputes of material fact and that Mattos and Ferron are entitled to qualified immunity.  In practice, this means two things.  First, any arguments MacRae might have had on those fronts have been waived.  Hamdallah, 91 F.4th at 18 n.21.  Second, even though MacRae appears to frame her appeal against Defendants collectively, by not challenging the district court's qualified-immunity decision, the only issue before this Court is the entry of summary judgment in favor of the District.

court's reasoning.  Hamdallah, 91 F.4th at 16; United States v. Soler-Montalvo, 44 F.4th 1, 7 (1st Cir. 2022).  In doing so, the bottom-line questions we must answer are whether there are any genuine disputes of material fact and whether the summary-judgment movants (here, Defendants) are entitled to judgment as a matter of law based on those undisputed facts.  Hamdallah, 91 F.4th at 16.  Crucially, however, in answering those questions we must examine the facts in the light most favorable to the summary-judgment nonmovant (here, MacRae) and draw all reasonable inferences supported by the record in her favor.  Rivera-Corraliza v. Puig-Morales, 794 F.3d 208, 214 (1st Cir. 2015).  A dispute is genuine when a reasonable factfinder could come out in favor of the nonmoving party based on the evidence, and a fact is material when there's a chance it could affect the case's ultimate outcome. Hamdallah, 91 F.4th at 16.

*The Framework*

Our standard of review in place, we first turn our attention to the parties' squabble over whether the First Amendment retaliation framework for claims brought by public employees applies to MacRae's claim.  As a refresher, MacRae argues we shouldn't apply that framework, whereas Defendants argue we should.  To explain our decision, we'd better start off with an explanation of that framework and its underlying rationale.

- 15 -

The right to speak on matters of public concern is guaranteed by the First Amendment. See U.S. Const. amend. I. And that right is not lost when an individual chooses to work for the government. See Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007). That said, in Garcetti v. Ceballos, the Supreme Court explained that government employers need some leeway in controlling their employees' speech for a variety of reasons:

> Government employers . . . need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

547 U.S. 410, 418-19 (2006) (internal citation omitted). Given these considerations, public employees' First Amendment rights "are not absolute," Curran, 509 F.3d at 44, and so public employees "by necessity must accept certain limitations on [their] freedom," Garcetti, 547 U.S. at 418. At the same time, though, they need only accept "those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti, 547 U.S. at 419; see also id. at 418 ("[T]he restrictions [the government entity] imposes must be directed at speech that has some potential to affect the entity's operations.").

The upshot of all this is that, when a state government employer retaliates against its employee for exercising First

- 16 -

Amendment rights, that employee can pursue a claim under 42 U.S.C. § 1983. See Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 134-35 (1st Cir. 2022). But, in order to balance the competing interests of the government employer and the employee, such a claim must be pursued under the well-established framework announced by the Supreme Court in Garcetti. 547 U.S. at 418 (describing framework); see Curran, 509 F.3d at 45 (noting Garcetti framework is "consistent with this circuit's prior three-part test").

At step one, we "determin[e] whether the employee spoke as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418. If the employee did not speak as a citizen on a matter of public concern, the inquiry ends there and "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id. If the employee did speak as a citizen on a matter of public concern, "then the possibility of a First Amendment claim arises" and we move on to step two. Id.

At step two, we must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. In answering this question, we "must balance the interests of the employee, as a citizen, in commenting upon matters of concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008)

- 17 -

(citation and internal quotations mark omitted). This balancing act is commonly referred to as Pickering balancing after the Supreme Court's decision in Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563, 568 (1968), which articulated the original version of the balancing test. If the balancing scales tip in the employer's favor, the inquiry ends there, and the employee's speech is not constitutionally protected. But, if the balancing scales tip in the employee's favor, the employee's speech "is protected speech under the First Amendment" and "[t]he analysis then proceeds to the third step." Ciarametaro, 87 F.4th at 88.

At step three, we determine whether the employee's protected speech "was a substantial or motivating factor in the adverse employment decision." Curran, 509 F.3d at 45. Even if the plaintiff satisfies their burden at all three steps, the employer then has the opportunity "to prove by a preponderance of evidence that 'it would have reached the same decision regarding the adverse employment event even in the absence of the protected conduct.'" Stuart v. City of Framingham, 989 F.3d 29, 35 (1st Cir. 2021) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)) (cleaned up). These three steps balance the opposing goals of "promot[ing] the individual and societal interests that are served when employees speak as citizens on matters of public concern and . . . respect[ing] the needs of

- 18 -

government employers attempting to perform their important public functions." Garcetti, 547 U.S. at 420.

Turning back to MacRae's argument, she urges us to chuck the Supreme Court's nuanced Garcetti framework for claims brought by public employees out the window and apply, in its stead, the framework for claims brought by private individuals against government entities who retaliate against them. That framework only requires consideration of whether the plaintiff can show that they engaged in constitutionally protected conduct and that there was a causal connection between the constitutionally protected conduct and the allegedly retaliatory response. Najas Realty, LLC, 821 F.3d at 141.[14] Notably, this framework, unlike the Garcetti framework, omits any consideration of the government's interest and, in MacRae's view, is therefore less "government friendly." According to MacRae, we should apply this less "government friendly" framework because "MacRae's speech occurred months before she was employed" by Defendants. Applying the Garcetti framework to pre-employment speech, MacRae warns, would force individuals who may want to eventually work for the

---

[14] Najas Realty, LLC, a First Amendment retaliation claim regarding a plaintiff's purchase of land and the defendants' opposition to the plaintiff's plan to develop that land, is not even remotely factually analogous to MacRae's case. 821 F.3d at 137, 139. In fact, this Court has no caselaw on the books applying the framework described in Najas Realty, LLC to a claim such as MacRae's.

government to self-censor.  In her view, because social media usage is ubiquitous and can start as early as twelve years old, applying the Garcetti framework to pre-employment speech would allow government employers "to fire employees because of their speech from their teenage years, even if the speech occurred 30 years prior to their employment."  Having taken the time to mull over MacRae's arguments, we decline her invitation to use the framework for private individuals and opt for the Garcetti framework for public employees.  And we do so for several reasons.

To start with the most obvious reason, the allegations at issue here involve a government employer firing its public employee for their speech.  As the Garcetti framework is used "[t]o determine whether an adverse employment action against a public employee violates her First Amendment free speech rights," Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011), MacRae's allegations place us squarely within that framework.  Indeed, the retaliatory response MacRae complains of -- namely, her termination -- is inexorably linked to the fact that she was a public employee.

Second, the framework MacRae would have us apply involves no consideration of the important government interests articulated in Garcetti.  We see no reason (and MacRae has provided none) why the government's interest in the efficient provision of public services would simply evaporate into thin air just because

the speech in question occurred prior to the start of employment and the employer did not learn of the purported disruptive speech until after the employee began working for it.

Third, the facts at issue here are a far cry from MacRae's hypothetical of a government employer firing an employee for speech "from their teenage years" that "occurred 30 years prior to their employment." MacRae's pre-employment speech was not nearly as temporally removed from the start of her employment. By MacRae's own recollection, she posted four of the six memes on March 16, 18, 24, and 29, 2021 -- only five months before her late-August-2021 interview and her September 1, 2021 start date. She then posted a fifth meme (again, according to MacRae's own timeline) on August 13, 2021 -- mere weeks before her interview and start date at Hanover High.[15] And don't forget, at the Bourne School Committee's September 22, 2021 meeting (which, to be clear, occurred while MacRae was already employed at Hanover High), she did not apologize for the memes but instead for the media attention her TikTok posts brought to Bourne Public Schools and the Bourne School Committee. This is not to say MacRae should or should not have apologized for her posts but, by failing to express any regrets for the substance of the posts, she essentially reaffirmed the views articulated therein while in a public forum and employed

---

[15] Nowhere does MacRae explain when in 2021 the other TikTok user allegedly tagged her in the track meet meme.

by Defendants. Indeed, at her deposition, MacRae confirmed she still held the views expressed in her posts "[o]ne hundred percent." In our view, therefore, the relatively short period of time between MacRae's posts and the start of her employment counsels in favor of applying the Garcetti framework to the facts at issue here.

Fourth, applying the Garcetti framework to pre-employment speech aligns with the limited caselaw dealing with similar claims. Between the parties' research and our own, we have located only two cases involving alleged First Amendment retaliation for pre-employment speech and, by our reading, both cases applied the Garcetti framework. The first case is Riel v. City of Santa Monica, No. CV 14-04692, 2014 WL 12694159 (C.D. Cal. Sept. 22, 2014). There, Elizabeth Riel ("Riel"), a newly-hired public affairs officer for the City of Santa Monica ("the City"), was fired because she had previously written newspaper articles that were critical of the City. Id. at *1-2. In denying the City's motion to dismiss, the court determined that Riel had stated a valid claim for First Amendment retaliation. Id. at *6-8. Notably, in analyzing the claim, the district court outlined the Garcetti framework (including by citing to that decision) and explicitly balanced the City's interest "in the effective administration of its duties" against Riel's First Amendment rights. Id. at *4, *6-7.

The second case is Cleavenger v. University of Oregon, No. CV 13-1908, 2015 WL 4663304 (D. Or. Aug. 6, 2015), which MacRae argues supports her position because, according to her, the court there supposedly applied the framework for private citizens to pre-employment speech. It did no such thing. There, the plaintiff James Cleavenger ("Cleavenger") claimed the University of Oregon Police Department ("UOPD") terminated him in part because of a pre-employment public speech that was posted to YouTube where he criticized the University of Oregon for providing tasers to UOPD officers. Id. at *2. To analyze Cleavenger's First Amendment retaliation claims, the court noted the analysis required consideration of the following factors:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Id. at *6 (quoting Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009)). The quoted text mirrors the framework announced in Garcetti and demonstrates that the Cleavenger court believed that framework applied even in the context of pre-employment speech. Moreover, the Cleavenger court cited Garcetti throughout its

- 23 -

decision.  Id. at *8-9, *14.  While the court certainly expressed misgivings about the implications of government retaliation for pre-employment speech, particularly given the advent of the internet, id. at *11-12, nothing in the decision even remotely suggests the framework for public employees' First Amendment retaliation claims should be set aside when the speech at issue is pre-employment speech.  To be sure, the parties in that case urged the court to apply the framework for private individuals to Cleavenger's pre-employment speech claim, but the district court did not even bother to mention that framework in its decision.

In sum, on these facts and this particular timeline of events, we see no pressing reason to depart from the Supreme Court's tried-and-true mode of analysis for public employees' First Amendment retaliation claims simply because MacRae posted the memes at most a few months before and at least a few weeks before her government employment.

*The Application*

Having determined that the Garcetti framework applies, all that is left for us to do is actually apply that framework to the facts at issue here.  Both parties agree that MacRae, in posting the memes, spoke as a citizen on a matter of public concern and the memes were a substantial and motivating factor behind Defendants' decision to terminate her employment, thereby satisfying steps one and three of this Court's application of the

_Garcetti_ framework. _Curran_, 509 F.3d at 45. Therefore, the sole issue that remains in dispute is step two -- the _Pickering_ balancing of MacRae's First Amendment interest and Defendants' interest in preventing disruption.

MacRae argues that her First Amendment interest outweighs Defendants' interest and the district court erred in concluding otherwise. Specifically, she argues that (1) a government employer's mere prediction of disruption is insufficient to outweigh an employee's interest in engaging in political speech; (2) the reasonableness of a government employer's prediction of disruption is a question for the jury; and (3) Defendants' prediction of disruption was unreasonable. None of these arguments persuade, and we'll explain why after a quick primer on _Pickering_ balancing.

While the _Pickering_ balancing inquiry is "a matter of law for the court to decide," _Bruce_, 34 F.4th at 138, it is also a "fact-intensive" inquiry, _Fabiano_ v. _Hopkins_, 352 F.3d 447, 457 (1st Cir. 2003) (citation and internal quotation marks omitted), demanding "a hard look at the facts of the case, including the nature of the employment and the context in which the employee spoke," _Decotiis_, 635 F.3d at 35. At bottom, the analysis "requires a balancing of the value of an employee's speech against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its

- 25 -

public service mission." Davignon, 524 F.3d at 103 (citation and internal quotation marks omitted) (cleaned up). The government employer's interest must be proportional to the value of the employee's speech; in other words, "the stronger the First Amendment interests in the speech, the stronger the justification the employer must have." Curran, 509 F.3d at 48 (citing Connick v. Myers, 461 U.S. 138, 150 (1983)). In analyzing the government's interest, a court may consider a whole host of factors, including "(1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision." Davignon, 524 F.3d at 104 (citations omitted). If, after taking into account all of these factors, we determine that "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public," Garcetti, 547 U.S. at 418, then the employee's speech is not constitutionally protected and no First Amendment retaliation claim lies.

Against that legal backdrop, we proceed to balance the parties' competing interests. Starting with MacRae, there is no dispute about the content of the memes. Viewing the facts in the light most favorable to MacRae (as we must on summary judgment), some of her memes touched upon hot-button political issues, such as gender identity, racism, and immigration. Accordingly, MacRae's First Amendment interest in posting the memes would

normally weigh in her favor on the Pickering scale because the Supreme "Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Connick, 461 U.S. at 145 (citation and internal quotation marks omitted). Here, though, MacRae's First Amendment interest weighs less than it normally would because some of her memes comment upon such hot-button political issues in a mocking, derogatory, and disparaging manner. See Curran, 509 F.3d at 49 ("Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balancing."); see also Bennett v. Metro. Gov't of Nashville & Davidson Cnty., 977 F.3d 530, 538-39 (6th Cir. 2020) (concluding that "speech . . . couched in terms of political debate" "was not in the 'highest rung' of protected speech" in part because it used an "offensive slur").  For example, the meme about Dr. Rachel Levine was clearly insulting and disparaging when it included the following text:  "'I'm an expert on mental health and food disorders.' . . . says the obese man who thinks he's a woman."  And you needn't take just our word for it.  MacRae herself stated that she could understand how not only the Dr. Rachel Levine meme, but also the track meet meme, could be viewed as derogatory towards transgender people.  As such, while MacRae's interest still weighs in her favor, it is not accorded the highest value by the First Amendment.

On the other side of the Pickering balancing scales, we have Defendants' interest in preventing disruption to the learning environment at Hanover High, which they cited as the reason for MacRae's termination in her termination letter. We have repeatedly recognized that a government employer has a legitimate and "strong interest in 'preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'" Díaz-Bigio v. Santini, 652 F.3d 45, 53 (1st Cir. 2011) (quoting Guilloty Perez v. Pierluisi, 339 F.3d 43, 52 (1st Cir. 2003)).

MacRae counters that, even if preventing disruption is a legitimate government interest, any such interest Defendants might have had should not weigh heavily in their favor because "no actual disruption took place." On that score, she is both right and wrong. To explain, she is right in the sense that the record includes limited evidence of actual disruption at Hanover High. While some teachers, like McLean and Pereira, were concerned about MacRae's TikTok posts and some students were aware of the posts and discussed them at school, there is no evidence in the record that Defendants received calls or complaints from students, parents, or community members. There is, likewise, no evidence in the record that teachers and administrators had to devote

significant school time to addressing disruptions caused by MacRae's posts.[16]

However, MacRae is wrong to suggest that the lack of evidence of actual disruption means Defendants' interest in preventing disruption cannot outweigh her First Amendment interest. That is so because "[a]n employer need not show an actual adverse effect in order to terminate an employee under the Garcetti/Pickering test." Curran, 509 F.3d at 49. An employer can rely, instead, on "a speech's potential to disrupt." Davignon, 524 F.3d at 105. And a government employer's reasonable prediction of disruption is afforded significant weight in the Pickering inquiry, even if the speech at issue is on a matter of public concern. Curran, 509 F.3d at 49 (quoting Waters v. Churchill, 511 U.S. 661, 673 (1994)).

In response, MacRae offers yet another comeback and one which we previewed above -- namely, that "[a] government employer's mere prediction of disruption is insufficient to outweigh an employee's interest in engaging in political speech." Setting aside the glaring issue that she did not raise this argument below and so it is waived on appeal, Hamdallah, 91 F.4th at 27 n.32, we

---

[16] In fairness, though, the Cape Cod Times article that first brought attention to MacRae's social media activity was published on Friday, September 17, 2021 and MacRae was placed on leave by that Monday. Accordingly, there was little opportunity in that interim for actual disruption to have occurred at Hanover High.

don't think her argument makes much sense given our caselaw. Quoting the Ninth Circuit's decision in Moser v. Las Vegas Metropolitan Police Department, MacRae argues that "the government cannot rely on mere speculation that an employee's speech will cause disruption" and "bare assertions of future conflict are insufficient to carry the day at the summary judgment stage." 984 F.3d 900, 909 (9th Cir. 2021) (citations omitted). Rather, (and, again, still quoting Moser), MacRae asserts that "[t]he government can meet its burden by showing a reasonable prediction of disruption." Id. at 908-09 (citation and internal quotation marks omitted) (cleaned up). But we see no difference between the quoted language from Moser and our own caselaw. For example, we have explained that "[t]he mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day," because the "record" must "support . . . allegations that [the] . . . speech . . . could disrupt . . . operations." Davignon, 524 F.3d at 105 (citation and internal quotation marks omitted). In this way, then, mere speculation of disruption has never been enough. Rather, and in line with the Ninth Circuit's Moser decision, we have explained that an employer's prediction of disruption must be reasonable based upon the record. See Bruce, 34 F.4th at 139.

And here, we struggle to see how Defendants' prediction of disruption was anything but reasonable.[17]  A brief recap of the facts explains why.  MacRae's TikTok posts became the subject of substantial media coverage.  Moser, 984 F.3d at 909 ("Courts have accepted a government employer's predictions of disruption when it provided evidence that the community it serves discovered the speech or would inevitably discover it," such as through media coverage.).  Bourne, a town less than an hour's drive away from Hanover, and its school system became embroiled in controversy over the exact same speech at issue here, and the evidence of disruption in Bourne was extraordinary.  Id. ("Courts also are more likely to accept a government employer's prediction of future disruption if some disruption has already occurred.").  For example, consider the following uncontroverted evidence of disruption:  (1) the controversy was a topic at two of the Bourne

_____

[17]  To briefly respond to MacRae's contention that the reasonableness of a government employer's prediction of disruption is a question for a jury, it is true that the Pickering inquiry can involve factual disputes for a factfinder but we have explained "the process ultimately embodies a legal determination appropriately made by the court in circumstances in which no genuine dispute exists as to the substance of what the employee said and did." Hennessy v. City of Melrose, 194 F.3d 237, 246 (1st Cir. 1999).  Here, no genuine dispute exists as to what MacRae said and did, and recall that MacRae does not argue on appeal that any genuine disputes of material fact remain.  And more to the point, this Court has repeatedly evaluated the reasonableness of a government employer's prediction of disruption as a matter of law.  See, e.g., Ciarametaro, 87 F.4th at 89-90; Díaz-Bigio, 652 F.3d at 55; Curran, 509 F.3d at 49-50.

- 31 -

School Committee's meetings; (2) the Bourne School Committee determined that some of MacRae's TikTok posts violated the core values of Bourne Public Schools; (3) the Bourne School Committee and Committee Chairperson were informed "that the social media posts directed at the LGBTQ population had circulated and staff and students were very upset"; (4) the Bourne Educators Association met in response to the posts and voted unanimously "to make a public statement against the comments made by" MacRae; and (5) at the Bourne School Committee's September 22, 2021 meeting, over a dozen people presented their concerns or support for MacRae.[18]

In addition to the goings-on at Bourne, Defendants had separate reasons specific to Hanover to reasonably predict disruption would ensue. To begin, MacRae had a much more public-facing and, particularly, student-facing role at Hanover being a teacher, than she did at Bourne, where she was just a member of the Bourne School Committee. Next, the Cape Cod Times article was published on Friday, September 17, 2021, and by that

---

[18] MacRae makes a passing argument that we cannot consider the events in Bourne -- a town a stone's throw away from Hanover -- in assessing the reasonableness of Defendants' prediction of disruption because Mattos testified that he was not influenced by what transpired there and Ferron testified that it did not factor into his decision-making process. We disagree. Even assuming that the events in Bourne did nothing to tip the scales in Mattos' and Ferron's decision-making, the Bourne community's reaction to MacRae's social media posts supports our conclusion that it was objectively reasonable for Defendants to predict that the posts were likely to cause disruption in Hanover.

Monday, Pereira had seen the article, determined it was about MacRae (despite the article not mentioning her affiliation to Hanover High), and was concerned about the effect her posts would have on the Hanover High student body. McLean also expressed concerns about her posts once he learned about them. Within days of MacRae being placed on administrative leave, McLean overheard students discussing her social media activity. MacRae's classes included LGBTQ+ students whose identities her posts could reasonably be seen to mock. The insulting nature of some of her TikTok posts (at least arguably) conflicted with the District's Belief of "[e]nsur[ing] a safe learning environment based on respectful relationships" and Core Value of "[r]espect[ing] . . . human differences." See Bennett, 977 F.3d at 539-40 (considering speech's potential to "undermine[] the mission of the employer" in Pickering balancing inquiry). And importantly, during MacRae's interview with Mattos, Galotti, and McLean, she "agreed that there w[ere] probably some students and staff that were aware of" her posts. Given the circumstances both at Bourne and at Hanover, Defendants were eminently reasonable in predicting disruption would be forthcoming if they did not act.

Further supporting this conclusion is the fact that nothing in the record suggests Defendants terminated MacRae's employment because of any personal dislike or disapproval of her posts (as opposed to for their stated concern of the posts'

potential to disrupt the learning environment at Hanover High). Mattos, Ferron, and Plummer consistently testified that students would not feel safe or comfortable learning from MacRae, given the potential to perceive some of her posts as transphobic, homophobic, or racist.[19]  See Davignon, 524 F.3d at 105 (considering whether government employer suspended employee "out of a legitimate concern that their speech compromised safety" or "because of their pro-union activity" in Pickering balancing inquiry).

MacRae offers two additional retorts, neither of which persuade.  First, she argues that Defendants' decision to fire her was made solely based on Mattos', Ferron's, and Plummer's subjective belief that her posts would cause disruption in the classroom.  But that argument is plainly untrue.  Defendants have pointed to the aforementioned specific facts and circumstances at Bourne and Hanover that support their prediction.  Moreover, giving Defendants the benefit of the doubt as it relates to their prediction aligns closely with Supreme Court precedent, which explains that our judicial higher-ups "have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to

_____

[19] MacRae appears to agree that Defendants were not motivated by any personal dislike of her posts because, while she argued that this was a genuine dispute of material fact before the district court and the district court ruled against her on that point, she does not challenge that ruling on appeal.

justify restrictions on the speech of the public at large." <u>Waters</u>, 511 U.S. at 673.

Second, MacRae argues that other evidence in the record suggests any prediction of disruption would be mere speculation. For example, she mentions that, during Defendants' investigation, she informed them that she never discussed political issues in the classroom, and she used students' preferred pronouns. We fail to see how either of these facts makes Defendants' prediction of disruption unreasonable. Even though MacRae did not discuss politics in class, the widespread media coverage made the content of her TikTok posts readily accessible. Similarly, the use of students' preferred pronouns doesn't move the needle in MacRae's direction where even she admits some of her posts could be seen as derogatory by LGBTQ+ students. MacRae also argues that, during discovery, Defendants learned that she had a positive relationship with a student in one of her nighttime classes, who is gay and from Cape Verde, despite that student knowing of her social media posts. MacRae, however, points to no evidence in the record that Defendants were aware of this when they decided to terminate her employment.

Ultimately, the record reflects that MacRae, a newly-hired teacher, was hired to educate a diverse population of young students. A few weeks after she started teaching, her social media posts became the subject of extensive media attention, after

the educators of Bourne, a neighboring town, concluded her posts (which appeared to denigrate the identities of some students) would be detrimental to Bourne's school community. Coupled with the undisputed evidence that some Hanover High students and teachers were aware of MacRae's posts and were discussing them, there is ample evidence to conclude that Defendants were reasonably concerned disruption would erupt, just as it did in Bourne. And given the significant weight afforded to a government employer's reasonable prediction of disruption, even when, as here, the speech at issue is on a matter of public concern, Curran, 509 F.3d at 49 (quoting Waters, 511 U.S. at 673), we conclude that Defendants "had an adequate justification for treating [MacRae] differently from any other member of the general public," Garcetti, 547 U.S. at 410, and Defendants' interest outweighs MacRae's. The district court, therefore, was correct in granting Defendants summary judgment.

## PARTING WORDS

For the reasons explained above, we affirm the district court. Each party shall bear their own costs.